**In re Donald Paul CLARK and Cynthia Rudd Clark, Debtors.**

**Robert C. BUTLER, Cyrillyn Y. Butler, Bobbie Lloyd, Joyce Lloyd, Michael Williams, Carol Williams, Scott Case, Connie Case, and George W. Sexton, Plaintiffs,**

v.

**Donald Paul CLARK and Cynthia Rudd Clark, Defendants.**

Bankruptcy No. 94–82501.

Adv. No. 94–8304.

United States Bankruptcy Court, W.D. Michigan.

Nov. 7, 1996.

---

Paul I. Bare, Traverse City, MI, for Plaintiffs.

Craig W. Elhart, Traverse City, MI, for Defendants.

## MEMORANDUM OPINION DISMISSING PLAINTIFFS' FIRST AMENDED COMPLAINT TO DETERMINE DISCHARGEABILITY OF A DEBT

JO ANN C. STEVENSON, Bankruptcy Judge.

The nondischargeability claims presented arise in a case referred to this Court by the Standing Order of Reference entered in this District on July 24, 1984; this is determined to be a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Accordingly, the bankruptcy court is authorized to enter a final judgment in this proceeding subject to those appeal rights afforded by 28 U.S.C. § 158 pursuant to Fed.R.Bankr.P. 8001 and 8002.

The following constitutes the Court's findings of fact and conclusions of law in accordance with Fed.R.Bankr.P. 7052. In reaching its determinations, the Court has considered the demeanor and credibility of all witnesses who testified, the exhibits admitted into evidence, and the parties' trial briefs and written closing arguments.[1]

## I. PROCEDURAL POSTURE

The Chapter 7 bankruptcy case that provides the jurisdiction for this adversary

1. This decision replaces the Court's unpublished opinion and order in this matter, issued February

proceeding was filed on June 1, 1994. On September 16, 1994, the Plaintiffs, by their former counsel Rex P. Cornelison, III, Esq., filed a nondischargeability complaint, initiating the adversary proceeding under consideration. By attorney Bare, Plaintiffs filed their amended complaint on June 15, 1995. Initially, nine Plaintiffs and two Defendants were involved. By the November 29, 1995 trial date, the five remaining Plaintiffs were Michael Williams, Carol Williams, Bobbie Lloyd, Joyce Lloyd, and George Sexton; as counsel stipulated to the dismissal of Defendant Cynthia Rudd Clark, only Donald Paul Clark remained as a Defendant.

Plaintiff Michael Williams did not appear at trial, and Plaintiff's counsel advised that he did not intend to present any evidence as to Mr. Williams. Accordingly, the Court finds that Plaintiff Michael Williams has not carried his burden of proof. Attorney Bare also made clear that, the allegations in their Amended Complaint notwithstanding, the Plaintiffs were no longer pursuing their § 727 objection to discharge action against Defendant Clark. Instead they were pursuing only their § 523 claims, specifically asking that various debts be declared nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (4), and (6).

## II. FINDINGS OF FACT

In the early 1980s Donald Clark (hereinafter "Mr. Clark," "Debtor," or "Defendant") began conducting financial planning seminars at various churches throughout the South along with his brother Kenneth. During these events Mr. Clark espoused a philosophy of "Christian stewardship," emphasizing the pursuit of high returns along with the avoidance of investment in entities which offend an investor's Christian beliefs. Mr. Clark's efforts were supported by a string of affiliated companies which he and others organized, such as People$ Financial Resources Corporation (hereinafter "PFRC") and Family Stewardship Planning, Inc. (hereinafter

1, 1996.

"FSPI").[2] It was clear from the trial testimony that Mr. Clark was the president and driving force behind many of these companies. Some of the companies sold financial planning services to the Christian community, while others were investment clubs, where members pooled their investment funds. In 1987, Mr. Clark founded the Genesis Income Investment Club (hereinafter "Genesis"), a general partnership geared toward people with at least $50,000 available for investing. Plaintiffs Bobbie Lloyd and George Sexton invested heavily with Genesis. Mr. Clark testified that he made most of Genesis' investment decisions within the guidelines outlined in Genesis member agreements and member surveys.[3]

In 1991, Mr. Clark became the subject of a highly publicized SEC investigation. In early 1992, he agreed to cease all of his business activities pending the outcome of that investigation. One result of this "freeze," still in place as of the trial date, is that many people who invested in the Donald Clark-related entities, including the Plaintiffs in this action, are left without access to their investment funds.

2. For a brief description of the entities mentioned in this Opinion, see the appended Glossary.

3. Some of these documents were admitted into evidence. *See* Defendant's Exhibit # 37 (hereinafter "Def.Exh.") (Genesis investor's agreement and partnership agreement); Def.Exh. # 41 (Genesis member response sheet); Def.Exh. # 82 (Genesis membership voting form).

4. Ms. Williams met Mr. Clark in person only once, in the Summer of 1987. During that meeting he offered her an investment opportunity which she eventually refused. Trial Transcript, Volume I, at 22–23, from day one of this two-day trial, November 29, 1995 (hereinafter, "Tr. # 1;" from day two, "Tr. # 2").

5. The Court allowed Ms. Williams to respond to several questions focusing on what Mr. Burks or Mr. Clark told her about her investments. *See* Tr. # 1 at 20–21. Defense counsel objected to the admission of the responses on hearsay grounds but the Court ruled that, in the interest of hearing as complete a fact scenario as possible, it would allow her to answer, later giving the testimony its appropriate weight, if any, in reaching its decision. Tr. # 1 at 30.
 Mr. Clark's statements to Ms. Williams regarding the nature of her investments were made out

## A. Plaintiff Carol Williams

In June 1986, Carol Williams met Charles Burks through a church group in Georgia. Mr. Burks was an employee of FSPI, a financial services company headed by Mr. Clark. Aware that Ms. Williams had been the beneficiary of funds following her first husband's death in June 1986, Mr. Burks approached her with investment opportunities. By that time Ms. Williams had become familiar with Mr. Clark's investment seminars. She testified that she was an inexperienced investor whose primary concern was the security of any investment she might make.

Ms. Williams also testified that although it was Mr. Burks with whom she most frequently discussed investments, she spoke by phone with Mr. Clark before making her initial investment.[4] She further testified that although Mr. Clark did not mention specific investments during the call, he said all her investments would be very conservative and very low risk.[5]

In the Summer of 1986, Ms. Williams invested $56,200 in three trusts administered by Sherry Armstrong, an attorney associated with Mr. Clark.[6] Specifically, $45,000 went

of court, but were not offered to prove the truth of matters asserted. Thus, they are not hearsay; rather, they were alleged to be "verbal acts." A "verbal act" is a statement which takes on legal significance by virtue of its being said, such as "I accept," where contract formation is at issue. Ms. Williams alleges that Mr. Clark's above-described statements were material misrepresentations of investments, which, if made, carry obvious legal significance for § 523(a)(2)(A) fraud purposes. Accordingly, the Court has considered Ms. Williams' testimony for this limited purpose.

6. The Plaintiff claimed she never received copies of the documents she signed authorizing the initial investments. In addition, the Plaintiff's testimony did not reveal which entity received the funds, nor who worked for or owned that entity, nor the nature of the investments funded. Ms. Williams testified that she was uncertain, but that she thought her investment was with FSPI. From the record it appears that Mr. Burks, Ms. Armstrong, and the Defendant were affiliated during mid–1986, when Ms. Williams was first contacted. However, the record also shows that Plaintiff Bobbie Lloyd may have invested in the same type of trust with the same entity as Ms. Williams. Evidence of his initial funding shows a signed trust agreement between Mr. Lloyd and his wife, and "S.B. Armstrong P.C." *See* Def. Exh. # 61.

into "Pension Plan # 1," an IRA investment trust. Another $10,000 was invested in "Pension Plan # 2," also an IRA investment trust. The remaining $1,200 was invested in a "will and trust." A letter from Ms. Armstrong to Ms. Williams stated that her return would be four percentage points over the prevailing prime rate of interest.[7]

In late 1986, Ms. Williams and her husband transferred some "Pension Plan # 1" money into several Family Stewardship Planning Associates ("FSPA") partnership interests, at Mr. Burks' suggestion. They withdrew $37,331 from the "Pension Plan # 1" account to finance seven FSPA partnership interest purchases of $5,333 each, leaving the rest of their investments intact. On their 1986 federal income tax returns the Williamses claimed losses of $37,331.

In August 1987, the Williamses agreed to sell their FSPA partnership interests to FSPI.[8] Under these "1987 Agreements" the Williamses were promised monthly interest payments at 17.1% with balloon payments due after forty-eight months.

During the period 1986 to 1991, Ms. Williams was repaid $4,000 in principal from the "Pension Plan # 1" account and received an unspecified amount of interest. This was in addition to the $37,331 she withdrew in late 1986. She also earned an unspecified amount of interest on the $10,000 invested in "Pension Plan # 2" during this period. By 1991, the Williamses had received approximately $25,000 in interest under the 1987 Agreements, though payments were often late. In addition, $22,431.39 of principal had been returned at Ms. Williams' request. Payments ceased in June 1991. Mr. Clark admits that the Williamses are still owed money under the 1987 Agreements.

It is unclear whether Ms. Williams received four points over prime on the "Pension Plan" trusts but she did receive some return, while some principal remains on account.

### B. Plaintiff George W. Sexton

George Sexton retired in 1987 from a long career as an account executive with a glass company, during which he amassed a sizable retirement fund. He held a B.S. in Business Administration. Mr. Sexton became acquainted with the Defendant through an April 1988 help wanted item advertising for financial planning consultants for the Stewardship Group, Inc., a corporation headed by Mr. Clark. Mr. Sexton answered the ad, and thereafter completed five to six days of training where he was taught about wills, trusts, powers of attorney, and the like, as well as how to solicit customers for the Stewardship Group's services. After passing a test given by the Stewardship Group, he began selling part-time. He met with Mr. Clark on many occasions and they discussed investments. At some point they discussed Mr. Sexton's investing with FSPI. Although Mr. Sexton did not recall Mr. Clark's mention of specific investments held by FSPI, he testified that Mr. Clark stated that member investors were earning twelve percent returns at the time.

Mr. Sexton testified that he had full trust in Mr. Clark regarding investments. To him, Mr. Clark seemed knowledgeable about financial matters, and he was impressed with Mr. Clark's philosophy of investing within the Christian paradigm. He would not have made any of these investments without this faith in Mr. Clark and his philosophy. He further testified that he sought assurances from Mr. Clark that his money would be used for very safe, government-backed investments. According to Mr. Sexton, Mr.

A November 3, 1986 letter from Ms. Armstrong to Ms. Williams, written on "Armstrong and Jones, P.C., Attorneys at Law" letterhead, confirmed the receipt of Ms. Williams' funding of "Pension Plan # 1," and was signed, "Sherry B. Armstrong, Trustee." Def.Exh. # 1.

7. The letter referred to is the November 3, 1986 letter mentioned *supra*, note 6.

8. Each document that evidences one of these seven agreements is titled, "Buy–Sell Agree-

ment." See Joint Exh. # 2–8. However, at trial Ms. Williams repeatedly referred to the late 1986 partnership interest purchases, also completed in seven transactions, as "buy-sells." The Court finds it helpful to distinguish the late–1986 from the 1987 transactions. Perhaps at the outset all of these transactions were intended as a single series of "buy-sells" of partnership interests, but the documentary record does not evince this.

Clark said that FSPI members funded only that type of investment. The Defendant denied making this promise.[9]

During 1988 and 1989, Mr. Sexton deposited approximately $123,000 into his FSPI account. Those funds earned approximately twelve percent per annum, all of which he re-invested. At some point in 1990 Mr. Clark told Mr. Sexton about Genesis, explaining that the Club partners were earning fourteen percent returns. Mr. Clark did not mention the specific ventures in which Genesis was invested, nor did Mr. Sexton inquire.[10] He restated his desire for only very conservative, government-backed investments, however, and testified that Mr. Clark told him that Genesis investments were only of that type. Mr. Clark denied making this promise.[11] By August 1991, Mr. Sexton had deposited $40,000 with Genesis plus his entire FSPI investment of approximately $160,000.

Also in 1988, Mr. Sexton invested in Innovative Insurance Company ("Innovative"). While the structure of this corporation was not made clear on the record, attorney Sherry Armstrong was certainly a key member of Innovative, which provided, among other things, term life insurance for FSPI members. Mr. Sexton testified that Mr. Clark told him that an investment with Innovative would be completely safe and secure.

In order to finance the Innovative investment Mr. Sexton first liquidated an IRA account at Merrill Lynch, using the funds to purchase Innovative stock. Innovative placed the funds in escrow as part of its statutorily required capital reserve fund, under the administration of Ms. Armstrong. The Innovative stock was then returned to Mr. Sexton's IRA account at Merrill Lynch, although his broker was reluctant to endorse this arrangement. Mr. Sexton testified that because the Innovative stock was held in his IRA account, he believed it would be regulated and protected by the federal government. He also testified that his goal in making this investment was to achieve high returns, related by Mr. Clark to be fourteen to fifteen percent. Mr. Sexton invested a total of $150,000 in this manner.[12]

Mr. Sexton's account with Genesis as of the trial date was approximately $206,000. He has never made a withdrawal. The Innovative investment has earned an unspecified return, all of which he has re-invested. Since 1992, Mr. Sexton has attempted to secure liquid funds from both investments with no success.

9. The FSPI "Investor's Form," signed by Mr. Sexton, was entered into evidence. Def.Exh. # 30. It reads, in part—
 I understand that my money will be . . . invested by the authorized committee in either mortgages, commercial papers, consumer loans, CDs, business ventures, or mutual funds.

10. Conflicting testimony was offered as to whether Mr. Clark promised Mr. Sexton a position on a Genesis "steering committee," a group that would decide which investments Genesis would pursue, as an inducement to his joining the Club. Mr. Clark testified that the committee was not organized until late 1991 or 1992. He also testified that Club members had always helped to guide which investments Genesis pursued, through Club surveys and informal meetings. *See infra* text accompanying note 21.

11. Documentary evidence, signed by Mr. Sexton, would not lead the reader thereof to conclude that Genesis invested only in 100% secure, government-backed investments. First, the "Investor's Agreement of [Genesis]" reads, in part—
 I understand that my money will be added along with other club investors and invested in installment contracts, mortgages, commercial paper, consumer loans, certificates of deposit, business ventures, mutual funds, and any other such investments as may be approved by the [partners]. . . .
 Def.Exh. # 37. Second, the Genesis "Partnership Agreement" reads, in part—
 4. **Purpose:** The purpose of [Genesis] is to invest . . . in installment contracts, mortgages, commercial paper, consumer loans, certificates of deposit, business ventures, mutual funds, or any other such investments as may be approved by the [partners]. . . .
 Def.Exh. # 37. Finally, on a one-page, four-question Genesis "Response Sheet," Plaintiff Sexton voted "No" to the following proposal:
 I affirm the [Genesis] direction of a continued diversification with more emphasis on a government guaranteed portfolio understanding that the impact of this philosophy *may* reduce the club's current earnings by as much as 1%.
 Def.Exh. # 41 (emphasis in original).

12. Documentation of the Plaintiff's Innovative investments was not offered for admission into evidence.

### C. Plaintiff Bobbie Lloyd

Bobbie Lloyd retired in 1990 from a successful career as a mechanical engineer. He, like Mr. Sexton, held a sizeable retirement fund. He met Defendant Clark in 1989 during a series of financial planning seminars conducted at Mr. Lloyd's church by Donald and Kenneth Clark. After listening to the Clarks' presentation, Mr. Lloyd and his wife, Plaintiff Joyce Lloyd, decided to have a will and trust prepared by Kenneth Clark. He asked them to produce a financial statement which Donald Clark reviewed, after which he advised the Lloyds that they could improve on the returns they had been receiving on their investments.

At some time during 1989, Mr. Clark told Mr. Lloyd about the "Personal Pension Plan" ("PPP"), a trust administered by attorney Armstrong.[13] According to Mr. Lloyd, Mr. Clark made a verbal promise that the PPP investment would be very conservative and collateralized.[14] Mr. Lloyd agreed to make the PPP investment, initially depositing $90,000 in an escrow account. Mr. Clark suggested that Mr. Lloyd direct his funds into a recorded lien on a piece of real estate in North Atlanta ("the Sugar Hill property"), which would generate a fourteen percent income stream. Mr. Lloyd agreed. He testified that Mr. Clark assured him that the investment was fully collateralized and that

mortgage foreclosure would be available in the event of default.[15]

In mid–1989, Mr. Clark described Genesis to Mr. Lloyd, who then began investing with the Club. Mr. Lloyd initially deposited $180,000 during August and September 1989. Following an unfavorable report on Genesis from a family member, Mr. Lloyd demanded and received a full refund. Mr. Lloyd's attorneys then investigated Genesis, and in December 1989 he re-deposited the $180,000. By early 1991, he had deposited approximately $210,000 with Genesis. Mr. Lloyd testified that Mr. Clark promised that all of Mr. Lloyd's Genesis investments would be government-secured.[16]

Mr. Lloyd began receiving monthly interest checks from both PPP and Genesis in early 1990. The return was approximately 13.5% on PPP and twelve percent on Genesis. In late 1991, Mr. Clark told Mr. Lloyd that PPP was in difficulty and that a transfer of funds out of PPP and into Genesis would be wise. Mr. Lloyd agreed. In December 1991 his entire PPP account of $97,907 was transferred to Genesis. By January 1992, Mr. Lloyd had invested his "life's savings" in Genesis.

During 1991, Mr. Lloyd and his wife had come to depend on the monthly interest

---

**13.** Documentation of the Lloyds' PPP investment was admitted into evidence. *See* Def.Exh. # 61. The record does not indicate whether the PPP investment was the same type as Carol Williams' "Pension Plan" investments. *See supra* text accompanying note 6 (discussion of Ms. Williams' trusts).

**14.** The documentary evidence suggests that Mr. Lloyd was willing to invest in somewhat riskier ventures. The PPP "Trust Agreement," signed by Plaintiffs Bobbie and Joyce Lloyd, lists the following authorized types of investments: CDs, money market funds, residential rental real estate, purchase of contracts and/or leases, commercial paper, mortgages, and collateralized loans to individuals, and to businesses (several of which were identified by name). Def.Exh. # 61 at 2.

**15.** Tr. # 1 at 220–21.

**16.** Documentary evidence shows that Mr. Lloyd signed the same Genesis "Investor's Agreement" and "Partnership Agreement" as those signed by

Plaintiff Sexton. *See* Def.Exh. # 45 (Mr. Lloyd's Agreements.); Def.Exh. # 37 (Mr. Sexton's agreements.). These agreements set out the range of permissible Genesis investments, not nearly all of which could be termed "government-secured." *See supra* text accompanying note 11 (discussion of Mr. Sexton's Agreements).

Defendant Clark introduced evidence indicating that in August 1991, Mr. Lloyd, given a choice between the following two investment strategies, voted for the first:

100% Growth and Yield Assets: These funds will be invested as the club has historically invested with a further mandate to diversify . . ., returns anticipated to be as high as possible.

----

____% Liquidity and Safety Assets: These funds will be invested in preferred stocks, regulated investments, bonds and government guaranteed instruments. Yield in the 8–10% range. Closely following the prime rate.

Def.Exh. # 82 (Genesis questionnaire). Mr. Lloyd testified that he voted this way "by mistake." Tr. # 1 at 253–54.

checks. In that year the Lloyds' Genesis checks were often delayed, which caused some distress. When the checks stopped altogether in early 1992, the couple asked Mr. Clark several times for advances on their Genesis account. Mr. Clark refused all such requests. Since that time Mr. Lloyd has investigated Genesis in an attempt to secure the return of his funds, but with no success.

### D. Plaintiff Joyce Lloyd

Joyce Lloyd became acquainted with Debtor Clark through her church, as described above in Section C. She signed the PPP investment documents, agreeing to abide by the terms of that trust.[17] However, also as described in Section C, the Lloyds withdrew all of their PPP funds before investing with Genesis, and only Mr. Lloyd signed the Genesis documents. Defense counsel argued that because the Genesis investments were solely Mr. Lloyd's, Ms. Lloyd was not a proper party in this matter. Ms. Lloyd responded that she owned half of the retirement funds which were invested, and therefore, any investments made by Mr. Lloyd were one-half hers.

While Defendant's argument has some merit, the Court notes that both Mr. Clark and the Lloyds seemed to treat the Genesis investments as Lloyd "family" investments.[18] That, coupled with Ms. Lloyds' participation in PPP, persuade the Court that she has standing to pursue her nondischargeability claims.

Ms. Lloyd testified mainly about her unsuccessful attempts to procure liquid assets from Genesis and from Mr. Clark.

### E. Testimony of Defendant Donald Clark

Though some of Defendant Clark's testimony has been summarized earlier in this opinion, we turn now to other of Defendant's trial testimony in an effort to relate as clearly as possible how Genesis operated and what led to its financial troubles.[19]

### 1. Genesis Investments

Mr. Clark's undisputed testimony was that the following were some of the major investments funded by Genesis:

—approximately $1 million, unsecured, for an educational software program being developed by former basketball great Jerry Lucas;

—$600,000 for a block of first mortgages, all of which were recorded and yielded 11 to 12.5% returns;

—a $450,000 loan to a local sporting goods retailer, secured by the store's inventory;

—a $280,000 loan to a corporation that owned the right to develop Miami Subs restaurant franchises in the Atlanta area, secured by the Miami Subs stock owned by the corporation;

—several loans to Donald Clark entities, all of which were repaid with interest.

Genesis also invested in government-backed mortgages through Paul Welch, an investment banker who was president and major stockowner of the Dallas-based Fiduciary Trust Bank of the Southwest ("Fiduciary"). Mr. Clark estimated that during the late 1980s, Fiduciary was managing up to $200 million in assets from various sources. Fiduciary often purchased SBA-backed mortgage packages on behalf of Genesis since the mortgage packages were of such large denomination that Genesis lacked the funds to purchase them on its own.[20] In a typical Genesis–Fiduciary transaction, the Club would wire funds to Mr. Welch, who would then pool those funds with other funds until

---

**17.** See Def.Exh. # 61; *supra* text accompanying note 13.

**18.** For example, Mr. Clark sent an October 2, 1989 newsletter welcoming "Bobbie and Joyce Lloyd" as new Genesis members. Def.Exh. # 65.

**19.** Mr. Clark testified primarily about Genesis. However, his relevant testimony as to the "Pension Plan," PPP, and Innovative investments has also been considered.

**20.** Mr. Clark explained that as Fiduciary was a trust bank, it held no funds on deposit; rather, Fiduciary pooled funds from various sources, invested them, and managed the investments. As for the Genesis funds, Defendant testified that he consulted closely with Mr. Welch concerning the specific investments that Mr. Welch pursued through Fiduciary. *See* Tr. # 2 at 70–76.

enough was available to purchase a mortgage package. From 1989 through 1991, Genesis invested approximately twenty percent of its funds through Fiduciary in this manner.

Concerning the balance of the Genesis investments, Mr. Clark testified that he made most of the investment decisions within the guidelines set out in the Genesis member agreements and surveys, and often after discussing investments with Club members.[21]

## 2. The Demise of Fiduciary and Genesis' Involvement

In mid–1990, Mr. Clark began negotiating with Mr. Welch for the purchase of Fiduciary. By mid–1991, he had secured a purchase option. Mr. Clark testified that although he personally owned the option, Genesis was to have been the eventual purchaser.[22] According to Mr. Clark, before ownership could change hands, the approval of a Texas banking authority was needed. When the authority conducted an investigation in 1992, it discovered irregularities. Subsequently, Fiduciary's capital was downgraded and the bank was seized in June 1992. Fiduciary closed in August 1992.

At the time Fiduciary was seized, approximately $40,000 to $80,000 of Genesis funds were invested in mortgage packages under Fiduciary's management. However, a more significant amount of Fiduciary-related Genesis money was at risk at that time: Genesis had loaned Mr. Welch $440,000 secured by his Fiduciary stock.[23] To date, Mr. Welch has only repaid approximately $40,000 of the loan.

## 3. The SEC Investigation and Freeze on Mr. Clark's Activities

At some point in 1991, all of Donald Clark's companies—excluding Genesis—were merged, leaving PFRC the surviving corporation. Pursuant to an after-the-fact attempt to publicly register PFRC stock, the SEC conducted an investigation. Mr. Clark testified that the SEC found "problems with the investment banker that we used."[24] The investigation eventually reached Genesis, since Genesis had $230,000 on loan to PFRC during this time.

In the stormy days of early 1992, Mr. Clark entered into an agreement with the SEC to cease all his business activities, including all Genesis activity. When Plaintiffs' counsel asked why he did not consult the other Genesis partners before agreeing to this "freeze," Mr. Clark responded that his counsel had assured him that a brief investigation would produce a finding that Genesis was beyond the authority of the SEC. After that brief delay, Genesis would be free to proceed with liquidation and distribution, he was advised. By the end of 1992, the Genesis membership had decided to liquidate the Club and distribute its assets, and a dissolution committee was formed. Mr. Clark's counsel advised that if he did not participate in the dissolution committee, it was even more likely that the SEC would allow Gene-

---

**21.** The following exchange took place at trial:

ATTORNEY BARE: Mr. Clark, you decided how [Genesis] money was going to be used, didn't you?
DEFENDANT: Yes, I did.
Q: And the investments were your investments, the investments you felt were right?
A: Within the guidelines of the surveys given to the membership, yes.
Tr. # 2 at 103–04. *See also supra* note 10.

**22.** Tr. # 2 at 96.

**23.** Mr. Clark insisted that the loan was not given in exchange for the purchase option, though the Genesis loan was extended near the time when the purchase option was agreed upon. In fact, according to Mr. Clark, no price was attached to the option. Tr. # 2, at 96. He also testified that although the decision to make the loan was sole-

ly his, he considered it a secure investment given the substantial value of Mr. Welch's Fiduciary stock. *Id.* at 127.

There was also testimony that the note evidencing the loan to Mr. Welch showed Donald Clark as payee, not Genesis. *See id.* at 140–42. Mr. Clark explained that PFRC, the parent company of the Clark entities, was to be offered an assignment of the option to purchase Fiduciary once it had become clear that the Texas banking authority would not allow Genesis to purchase the bank. The note in favor of Donald Clark was a replacement note, drawn up pursuant to the described events; he testified that he always considered the note to be Genesis property, never his personally. *Id.* at 141–42.

**24.** Tr. # 2 at 84. The Court assumes that Mr. Clark was referring to Fiduciary investment banker Paul Welch.

sis to liquidate. Accordingly, he attempted to distance himself from dissolution committee proceedings.[25]

Mr. Clark further testified that under the SEC freeze, which went into effect on January 24, 1992 and was still in place as of the date of trial, Genesis is enjoined from collecting on its outstanding loans or other investments, and from receiving funds from any source. Since the freeze went into effect Genesis has distributed no assets to its partners.

## III. ANALYSIS

The Supreme Court has instructed that a claimant seeking to have a debt declared nondischargeable must prove each element of its case by a "preponderance of the evidence." *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). We are also advised that exceptions to discharge are to be strictly construed in favor of the debtor. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Manufacturer's Hanover Trust Co. v. Ward (In re Ward)*, 857 F.2d 1082, 1083 (6th Cir.1988).

### A. Plaintiffs' § 523(a)(2)(A) Claims

Plaintiffs first seek nondischargeability under § 523(a)(2)(A), which denies an individual a discharge for a debt "for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, false representation, or actual fraud...."[26]

According to recent Sixth Circuit precedent, the successful § 523(a)(2)(A) claimant—

must prove that the debtor obtained money through a material misrepresentation that at the time the debtor knew was false or made with gross recklessness as to its truth. The creditor must also prove the debtor's intent to deceive. Moreover, the creditor must prove that it reasonably relied on the false representation and that its reliance was the proximate cause of loss. *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 961 (6th Cir.1993). The very recent Supreme Court case of *Field v. Mans*, —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), modified these requirements in one particular. *Field* held that the proper standard for reliance is not the above-noted objective or "reasonable" standard, but the more subjective "justifiable" reliance standard.[27]

### 1. Plaintiff Carol Williams

■ Defense counsel argued, and the Court agrees, that it is helpful to separate Ms. Williams' "Pension Plan" investments from her investment under the 1987 Agreements.[28] After analyzing both investments, we find that Ms. Williams has not carried her § 523(a)(2)(A) burden of proof.

Beginning with Ms. Williams' investment in the "Pension Plan" trusts, her claim suffers from a fundamental flaw: she failed to show that Mr. Clark personally obtained a "substantial benefit," that is, that he obtained property of some kind, as a result of her initial $56,200 investment. While courts disagree over whether such benefit is required in a successful § 523(a)(2)(A) action, the Western District of Michigan has held that it is. *McHenry v. Ward (In re Ward)*, 115 B.R. 532, 538 (W.D.Mich.1990); *see also Sim-*

---

25. Tr. # 2 at 106–08.

26. 11 U.S.C. § 523(a)(2)(A).

27. Although neither party raised the issue, because *Field* was decided only one day before this trial was held, one might question whether *Field* should be given retroactive effect. In general, courts apply the law in force at the time a case is decided. *See Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 486 n. 16, 101 S.Ct. 2870, 2879 n. 16, 69 L.Ed.2d 784 (1981). *Field* would be applicable here under the general rule.

In some cases undue hardship could result from strict application of the rule. *See Chevron*

*Oil Co. v. Huson*, 404 U.S. 97, 106–107, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971) (plurality opinion established three-part test for nonretroactivity). However, as shown below, while *Field* makes it easier for plaintiffs to prove § 523(a)(2)(A) reliance in the Sixth Circuit, no Plaintiff in this case was able to carry its burden, even under the new standard. Therefore, no prejudice has resulted, and we apply *Field* under the general rule of retroactivity.

28. See *supra*, Findings of Fact, Section A, for a description of these investments.

*mons v. Wade (In re Wade),* 43 B.R. 976 (Bkrtcy.D.Colo.1984); *contra, Ashley v. Church (In re Ashley),* 903 F.2d 599 (9th Cir.1990); 3 COLLIER ON BANKRUPTCY ¶ 523.08 at 523–44 (15th ed. 1996) (collects cases, concludes that no benefit need be shown).

It appears that Mr. Clark was affiliated with Ms. Armstrong and Mr. Burks during the time when Ms. Williams was considering whether to invest. However, Ms. Williams failed to convince the Court that Mr. Clark was in such close affiliation with Ms. Armstrong that an investment in the "Pension Plan" trusts benefitted him financially.[29] Attorney Armstrong administered the trusts. By her own testimony Ms. Williams' main contact was Mr. Burks, and, by and large, it was he who explained the investments. The documents in evidence as well as the trial testimony show that Mr. Clark did not became closely involved with Ms. Williams or her funds until the 1987 Agreements were struck, nearly a year after she initially invested in the "Pension Plan" trusts. Because Ms. Williams did not establish that Donald Clark benefitted from those investments, her fraud claim must fail. *See In re Ward, supra,* at 537–38.

Turning to the 1987 Agreements, Ms. Williams has failed to prove a key component of her claim. To restate a requirement from *In re McLaren, supra,* a successful § 523(a)(2)(A) claimant must prove that the debtor "obtained money through a material misrepresentation that at the time the debtor knew was false or made with gross recklessness as to its truth." *McLaren, supra,* at 961. Ms. Williams presented no evidence that Mr. Clark—through FSPI—entered into the 1987 Agreements intending not to fulfill his obligations thereunder. Instead, the record shows that the Agreements were purchase contracts under which the Williamses

were to receive a very high rate of return over time. Ms. Williams has not alleged that Mr. Clark promised anything more. In fact, the Williamses received not only interest at the promised rate for over two years, but they secured the return of a substantial amount of principal before it was due them under the Agreements. This evidence suggests that upon entering the 1987 Agreements, Mr. Clark intended to fulfill his contractual obligations thereunder.

■ The wrongdoing which is actionable under § 523(a)(2)(A) must have been committed at the time the debt at issue is incurred, not at the time some other alleged wrongdoing occurred. *ITT Financial Services v. Hulbert (In re Hulbert),* 150 B.R. 169, 172 (Bkrtcy.S.D.Tex.1993); *Waitman v. Steed (In re Steed),* 157 B.R. 355, 357 (Bkrtcy. N.D.Ohio 1993) (breach of a properly formed contract was not evidence that the contract was the product of fraud). Because nothing on the record persuades the Court that Mr. Clark engaged in such wrongdoing at the time the 1987 Agreement debts were incurred, the debts owed by Mr. Clark to Ms. Williams are not nondischargeable under § 523(a)(2)(A).

## 2. Plaintiff George W. Sexton

■ George Sexton testified that Mr. Clark promised many times that Mr. Sexton's investments were completely secure, essentially riskless propositions. Clearly they were not. However, the Court is not persuaded that Mr. Sexton's losses were the product of Mr. Clark's § 523(a)(2)(A) fraud.

Though the parties disputed whether Mr. Clark made the representations alleged, the Court will assume for the moment that he did.[30] Furthermore, Mr. Clark's unwilling-

---

**29.** Nor is the Plaintiff assisted by the case of *BancBoston Mortgage Corp. v. Ledford (In re Ledford),* 970 F.2d 1556 (6th Cir.1992), *cert. denied,* 507 U.S. 916, 113 S.Ct. 1272, 122 L.Ed.2d 667 (1993). In that case a general partner perpetrated a fraud of which another general partner—the debtor/defendant in the § 523(a)(2)(A) action—had no knowledge. The court held that the fraud of the offending partner could be imputed to the "innocent" debtor/partner where the debtor shared in the fruits of the fraud. *Id.* at 1561; *accord, Strang v. Bradner,* 114 U.S. 555, 561, 5

S.Ct. 1038, 1041, 29 L.Ed. 248 (1885). In this case, no fraud by Ms. Armstrong was proved; as explained below, there was no proof that Mr. Clark received any financial benefit from Ms. Williams' "Pension Plan" investment.

**30.** In Defendant's Final Argument, at page 7, Attorney Elhart argued that since each Plaintiff testified that Mr. Clark "never gave them bad advise (sic) or told them something that turned out to be wrong," no misrepresentations were made, and therefore a discussion of reliance is

ness to admit to an intent to deceive is not fatal to Sexton's or the other Plaintiffs' cases. It is proper to offer circumstantial evidence of a debtor's state of mind in these matters since direct evidence of intent is practically impossible to obtain. *ITT Financial Services v. Long (In re Long)*, 124 B.R. 54, 56 (Bkrtcy.N.D.Ohio 1991) (*citing Matter of Van Horne*, 823 F.2d 1285, 1287 (8th Cir. 1987)). Again, the testimony was in conflict. Because a reasonable inference can be drawn in either party's favor on this issue, we will assume Mr. Clark's intent to deceive the Plaintiff for purposes of discussion.

The Plaintiff must next prove he justifiably relied on the misrepresentations. It is here that his claim bogs down.

Until the Supreme Court decided *Field, supra*, there was a split of authority as to the proper test for reliance in § 523(a)(2)(A) cases. Some Circuits, including the Sixth, used the objective, "reasonableness" standard. *See, e.g. In re McLaren, supra*. Under this test, creditors were charged with the competence of a reasonable person and with a duty to seek out certain readily obtainable facts. Other Circuits applied the less rigorous and more subjective "justifiable" standard. *See, e.g., Mayer v. Spanel International Ltd. (In re Mayer)*, 51 F.3d 670 (7th Cir.1995). Under this standard a creditor could be justified in relying on a misrepresentation even though he could have discovered its falsity through an investigation, and even if a "reasonable person" would have discovered that falsity. As explained in *Field*, whether justifiable reliance is present

> seems to turn upon the individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case.

*Field, supra*, at ——, 116 S.Ct. at 444 (citation omitted). Thus, the test for justifiable reliance is not a wholly subjective one, in that the creditor is charged with notice of facts which could have been discovered by a cursory observation. *Id.* Furthermore, reasonableness is still relevant, "for the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact." *Id.* at ——, 116 S.Ct. at 446.

It simply cannot be said that Mr. Sexton justifiably relied on Mr. Clark's statements. Not only was he educated and well-experienced in business matters, but even a casual reading of the relatively brief Genesis "Investment Agreement" and "Partnership Agreement" documents show that the Club members contemplated investments that were less than fully secured and subject to risk.[31] His vote *against* Genesis' pursuing more secured, government-backed investments shows even more convincingly that Plaintiff Sexton could have readily ascertained that the investments Genesis was making during that time carried some risk. Indeed, when given a chance to sacrifice higher returns in favor of greater security, he documented his support for the riskier strategy.[32]

Mr. Sexton's trial testimony portrays him as an investor who enjoyed high returns and who seized upon every opportunity Mr. Clark presented in hopes of achieving them. The Court finds that Mr. Sexton's reliance cannot be justified in light of this testimony, his experience as a business person, the circumstances he faced, and his documented, inconsistent actions. Therefore, Plaintiff Sexton's § 523(a)(2)(A) claim against Mr. Clark is dismissed.

### 3. Plaintiff Bobbie Lloyd

■ Essentially the same analysis applies to Bobbie Lloyd's § 523(a)(2)(A) claim as was applied to Mr. Sexton's. Mr. Lloyd testified that Mr. Clark promised him many times that any investment with Genesis would be 100% backed by the federal government.[33] As with Plaintiff Sexton, we assume without

unnecessary. We disagree. The testimony evinces a sharp conflict between the Plaintiffs and Mr. Clark as to what he told them about their investments. We find no basis to dismiss out of hand either side's contentions.

**31.** *See* Def.Exh. # 36.

**32.** *See* Def.Exh. # 41.

**33.** *See, e.g.* Tr. # 1 at 228.

deciding that Mr. Clark made such statements, which were representations of facts Mr. Clark knew at the time to be false, and which were made with the intent to deceive Mr. Lloyd. We turn now to the question of whether his reliance thereon was justified, and find that it was not.

Mr. Lloyd portrayed himself as a fairly knowledgeable investor. He was an accomplished mechanical engineer by profession but also seemed able to understand basic financial matters. His attorneys investigated Genesis before he invested. Also, he signed the Genesis "Investment Agreement" and "Partnership Agreement" documents, which show, under the most cursory scan, that Genesis investments were not riskless. Even more damaging to his claim is the vote he made in an August 1991 Genesis member survey: he voted to direct 100% of Genesis funds into "Growth and Yield Assets: These funds *will be invested as the club has historically invested* ...;" he voted to direct *no* funds into "Liquidity and Safety Assets: These funds *will be invested in preferred stocks, regulated investments, bonds and government guaranteed instruments....*"[34] His statement that he voted this way by mistake is unconvincing.

Mr. Lloyd apparently hoped his funds would be secure. However, he willingly sought very high-yield investments. The Court finds that based on his testimony, the signed Genesis Agreements, and his documented desire for Genesis to pursue high yields at the expense of security, Mr. Lloyd's reliance upon Defendant's statements cannot be justified. Therefore, Plaintiff Bobbie Lloyd's § 523(a)(2)(A) claim must be dismissed.

As for Mr. Lloyd's Innovative stock purchase, the record does not reveal the degree of riskiness of that investment. In any event, as in the case of Plaintiff Williams, Mr. Lloyd did not show that Mr. Clark benefitted from Mr. Lloyd's investment. Without that critical link, his § 523(a)(2)(A) claim concerning this investment must also fail.[35]

### 4. Plaintiff Joyce Lloyd

As noted *supra* in Findings of Fact Section D, Joyce Lloyd's claim against Mr. Clark, at least insofar as the Genesis investments are concerned, is derivative of her husband Bobbie Lloyd's claim. It is apparent from the record that Mr. Clark made no representations to Ms. Lloyd which may have induced her to invest in Genesis. She was a party to the PPP trusts under Ms. Armstrong's administration, but that investment paid handsome returns, and nothing was lost. When funds were withdrawn from PPP, only Mr. Lloyd invested in Genesis. In any event, to the extent Mr. Lloyd's Genesis funds can be considered one-half owned by Ms. Lloyd, the analysis of Mr. Lloyd's § 523(a)(2)(A) claim applies to her. Therefore, her claim is dismissed.

### 5. The Role of Religion in the Investments at Issue

■ Throughout their testimony the Plaintiffs made much of the religious aspect of their investing in the Donald Clark-related entities. Carol Williams became familiar with Mr. Clark through her church, as did Bobbie and Joyce Lloyd. The Plaintiffs present at trial all testified that Mr. Clark's Christian stance was a primary reason for their investing as they did. However, no Plaintiff provided evidence that Mr. Clark made religious-based misrepresentations concerning their investments. The representations at issue concerned the safety of the investments. While a fraud perpetrated in the name of religion may seem particularly repugnant,[36] the Plaintiffs did not prove fraud of any kind under § 523(a)(2)(A). And the Court will not imply fraud merely because Mr. Clark applied a Christian philosophy to investing, or because his approach was a factor Plaintiffs considered before they invested. *See In re The Bible Speaks,* 869

---

**34.** Def.Exh. # 82 (emphasis added).

**35.** *See Ward, supra,* at 537–38; *supra,* Analysis Section A (discussion of "substantial benefit" requirement).

**36.** *See, e.g. Love v. Love (In re Love),* 182 B.R. 161 (Bkrtcy.W.D.Ky.1995) ($156,000 transferred to a spiritual advisor was held recoverable under the theory of undue influence).

F.2d 628, 642 (1st Cir.1989) (the mere existence of a spiritual advisor/client relationship is not enough to prove undue influence).

### B. Plaintiffs' § 523(a)(4) Claims

The Plaintiffs also brought claims alleging "fraud or defalcation while acting in a fiduciary capacity."[37] Well-settled case law dictates that in order to establish the non-dischargeability of a debt for fraud or defalcation while acting in a fiduciary capacity under § 523(a)(4), a claimant must prove, by a preponderance of the evidence, that 1) the property at issue was the subject of an express trust; 2) the debtor was acting in a fiduciary capacity with respect to the property; and, 3) the debtor breached the resulting fiduciary duty by at least a "defalcation" of funds. *Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate)*, 760 F.2d 121, 124 (6th Cir.1985).

■ Under § 523(a)(4), the requirement that funds at issue must be subject to an express or technical trust mandates that trusts implied at law are insufficient. *In re Interstate, supra*, at 124; *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 251–52 (6th Cir.1982) (interpreting § 17(a)(4) of the Bankruptcy Act); *Smallwood v. Howell (In re Howell)*, 178 B.R. 730 (Bkrtcy.W.D.Tenn.1995). That is, both the trust status of funds and the concomitant fiduciary duty to manage the funds must arise when the debt is incurred, not at the time of the alleged wrong. *See In re Interstate, supra*, at 124; *Johnson, supra*, at 251–52 (upon receipt from customers, insurance premium payments were subject to an express trust and the insurance company had a fiduciary duty to manage the funds).

In addition, the debtor-creditor relationship is not one which will invoke § 523(a)(4) without more. *Moore v. McQueen (In re McQueen)*, 102 B.R. 120, 124 (Bkrtcy. S.D.Ohio 1989); *Leeb v. Guy (In re Guy)*, 101 B.R. 961, 983 (Bkrtcy.N.D.Ind.1988); 3 NORTON BANKRUPTCY LAW AND PRACTICE 2d at § 47.22. One commentator makes a distinction between a person intended to hold funds in a segregated account for the creditor's benefit (a fiduciary) from one intended to have unrestricted use of the creditor's funds (not a fiduciary). NORTON, *supra*, at § 47.20.

### 1. Plaintiff Carol Williams

As with her § 523(a)(2)(A) claims, the Court finds it helpful to separately analyze Ms. Williams' "Pension Plan" trusts from the 1987 Agreements for § 523(a)(4) purposes.

Concerning the "Pension Plan" investments, the Plaintiff must first prove that Mr. Clark owed Ms. Williams a fiduciary duty to manage her "Pension Plan" funds. As mentioned *supra* in Findings of Fact section A, while it appears that Mr. Clark and fund administrator Ms. Armstrong were affiliated in some way during the time Ms. Williams contemplated investing, there is no evidence that he exercised control over "Pension Plan" funds or that he had any right to do so. In short, while those funds may have been subject to an express trust, Ms. Williams did not prove that Mr. Clark had a fiduciary duty to manage the trust. Lacking this proof, Ms. Williams' § 523(a)(4) claim must be dismissed.

■ Turning to those funds subject to the 1987 Agreements, Ms. Williams did not show that Mr. Clark's relationship with her was more than one of creditor-debtor. She cannot point to a separate fund which he was to manage for her benefit, nor did she cite any statute or legal theory which would support a finding of a fiduciary relationship. Both the trial testimony and the signed documents show simple arrangements under which Mr. Clark's company, FSPI, was to purchase the Williamses' partnership interests over time with interest. No trust agreement was struck and no promise was made to maintain the funds in a segregated account for the Williamses' benefit. That FSPI later defaulted on its obligations is irrelevant for § 523(a)(4) purposes. We find that at the time the 1987 Agreements were made the funds were not the subject of an express trust, and further that Mr. Clark owed no fiduciary duty to Ms. Williams under the 1987 Agreements. Accordingly, the amounts

---

**37.** 11 U.S.C. § 523(a)(4).

owed are not nondischargeable under § 523(a)(4).

## 2. Plaintiffs George Sexton and the Lloyds

 As for the § 523(a)(4) claims of the three remaining Plaintiffs, the Court need only address the "defalcation" element of the aforementioned three-part test. That is, we will assume, without deciding, that all the Plaintiffs' investments at issue were subject to express trusts over which Mr. Clark had a fiduciary duty. The Plaintiffs are left to prove that Mr. Clark committed at least a defalcation with respect to those funds. They have failed to carry this burden.

The term "defalcation" is not defined in the Code and courts have disagreed as to its meaning. *See, e.g., Meyer v. Rigdon,* 36 F.3d 1375, 1383–84 (7th Cir.1994); *In re Johnson, supra,* at 254–57.[38] *Johnson* held that while proof of negligence or mistake of fact will not support a finding of defalcation, proof of actual fraud is not required. *Johnson* at 256. A bad act which will amount to defalcation in a fiduciary capacity

> is supplied by an individual's special legal status with respect to another, with its attendant duties and high standards of dealing; and the act of breaching those duties.

*Johnson* at 255. It is clear from *Johnson* and other cases that a defalcation might not rise to the level of actual fraud, since wrongful motive is an element of fraud but not of defalcation. For example, the existence of a "deficit resulting from a fiduciary's duty to make the proper payment of money coming into his possession" was held sufficient to prove defalcation but insufficient to prove fraud. *Id.*

Moreover, recent cases suggest that a negligent or an "innocent" default or misallocation of funds may be considered a defalcation. Indeed, one bankruptcy court has held that the term encompasses more than a failure to account for funds. In *In re Garver,* 180 B.R. 181, 184–85 (Bkrtcy.N.D.Ohio 1995) it was held that a debtor's mere failure to meet an obligation constituted a § 523(a)(4) defalcation.[39]

Plaintiffs Sexton and the Lloyds have all claimed that they have tried without success to locate the funds they invested in entities owned and/or managed by Mr. Clark. We agree that if he had a fiduciary duty to manage the Plaintiffs' funds and refused to provide an adequate accounting, Mr. Clark would be guilty of defalcation. *See Johnson* at 255. Furthermore, if it appeared that funds were lost or missing, the burden of proof might shift to the debtor/fiduciary. *See In re Little, supra,* at 500. However, the Plaintiffs did not prove by a preponderance of the evidence that Mr. Clark faltered in this way. Consequently, Plaintiffs' § 523(a)(4) actions must fail.

As described *supra* in Findings of Fact section E, the SEC began an investigation of Mr. Clark's business activities in 1991. He subsequently agreed to cease all such activities. In particular, he agreed to cease the dissolution of Genesis, but stated that once the SEC freeze is lifted, he will attempt to return funds to the partners. Mr. Clark testified that all funds are still on account with Genesis and are still invested in ventures in which he and the partners agreed to invest, including government-backed mortgages, several large commercial loans, as well as the probably ill-advised personal loan to investment banker Paul Welch. In light of this testimony, the Court cannot say that Mr. Clark has failed to account for funds, or

---

**38.** The Court recognizes that no independent cause of action for defalcation exists under authority of § 523(a)(4), but that substantive non-bankruptcy law will determine whether defalcation has occurred. *See Cappella v. Little (In re Little),* 163 B.R. 497, 499 (Bkrtcy.E.D.Mich. 1994). The Plaintiffs did not bring to the Court's attention, nor did our independent research reveal any non-bankruptcy law that supports a finding of defalcation under the undisputed facts presented.

**39.** *Id.* at 184–85. Black's includes this entry under "defalcation":

> For purposes of [11 U.S.C. § 523(a)(4), defalcation] is failure to meet an obligation, misappropriation of trust funds or money held in any fiduciary capacity, and failure to properly account for such funds.

BLACK'S LAW DICTIONARY 417 (6th ed. 1990) (*citing In re Anderson,* 64 B.R. 331, 334 (Bkrtcy.N.D.Ill. 1986)).

that he failed to meet an obligation to the Plaintiffs.

For their part, the Plaintiffs' claims that the investments have "disappeared" are more properly viewed as demands for the return of funds which are subject to the SEC freeze. Such unmet demands, while not necessarily unreasonable under the difficult circumstances they face, are not sufficient proof of Mr. Clark's defalcation. His offer to document the status of Genesis' investments militates in his favor on this issue, but more persuasive is the undisputed testimony that Mr. and Mrs. Clark are heavily invested in many of the same ventures as the Plaintiffs, and like them, their funds are frozen. Finally, no evidence was presented, nor was any allegation made, that Mr. Clark or his family have absconded with the Plaintiffs' funds.

In short, even when the Court scrutinizes Mr. Clark's actions under the high standards to which fiduciaries are held, he cannot be said to have committed a defalcation of the Plaintiffs' funds. Accordingly, the § 523(a)(4) claims of Plaintiffs George Sexton, Bobbie Lloyd, and Joyce Lloyd are dismissed.

### C. Plaintiffs' § 523(a)(6) Claims

Plaintiffs' final claims arise under § 523(a)(6), which denies an individual discharge of debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." [40]

A "willful and malicious injury" has been defined as "a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse." *Perkins v. Scharffe*, 817 F.2d 392, 394 (6th Cir.1987) (citation omitted). Though not made clear in either the pleadings or the testimony, conversion appears to be the only conceivable theory open to Plaintiffs under § 523(a)(6). Proof of conversion can support a § 523(a)(6) action. *McIntyre v. Kavanaugh*, 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916); *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443, 1451–52 (6th Cir.1994). Conversion is defined as, among other things, the "unauthorized and wrongful exercise of

dominion and control over another's personal property, to the exclusion of or inconsistent with rights of [the] owner." *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228 (6th Cir.1991) (*citing* BLACK'S LAW DICTIONARY 332 (6th ed. 1990)).

#### 1. Plaintiff Carol Williams

■ As discussed *supra* in Analysis Section A, Ms. Williams has not proved that Mr. Clark committed § 523(a)(2)(A) fraud with respect to the 1987 Agreements. The same analysis applies to her conversion claim. Under the 1987 Agreements she earned both a very healthy return and retrieved a substantial amount of principal long before it was due. Mr. Clark testified, and the evidence did not refute, that her account is currently subject to the SEC freeze. As for her "Pension Plan" trusts, Ms. Williams has received some return and has some funds remaining on account. More importantly, the record shows that those funds were the responsibility of Ms. Armstrong, not Mr. Clark.

In short, Ms. Williams made no showing that Mr. Clark exercised "unauthorized and wrongful dominion and control" over her funds. Having failed to prove Mr. Clark's conversion of any funds, Plaintiff Williams' § 523(a)(4) claim is dismissed.

#### 2. Plaintiffs Sexton and the Lloyds

Following the discussion *supra* in Analysis Section II, the Court concluded that Mr. Clark did not commit a defalcation of the funds at issue in this matter. As discussed below, the Plaintiffs have failed to persuade the Court that Mr. Clark is guilty of conversion.

■ All four of the Plaintiffs who testified at trial convinced the Court that they are disappointed with the results of their investments, but none submitted evidence which tended to show that their losses resulted from Mr. Clark's conversion of funds. Perhaps unwisely, Mr. Sexton, Mr. Lloyd, and the other Genesis members endowed Mr. Clark with great power in making Club investment decisions. To prove conversion under § 523(a)(6), however, Plaintiffs were

---

**40.** 11 U.S.C. § 523(a)(6).

required to show that Mr. Clark willfully exceeded this authority with the intent to use the funds for his own, improper purposes. *See Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 330–35, 55 S.Ct. 151, 152–54, 79 L.Ed. 393 (1934) (Cardozo, J.) (technical or implied conversion will not support a finding of willful and malicious injury). They failed in this task. Accordingly, the § 523(a)(6) claims of Plaintiffs George Sexton, Bobbie Lloyd, and Joyce Lloyd are dismissed.

## CONCLUSION

The Court understands the frustration that the Plaintiffs must feel over their experience with the Donald Clark-related entities. They have invested substantial sums of money which they have tried and failed to retrieve from Genesis and other sources since early 1992. They made these investments hoping to receive substantial returns. To say that their hopes have gone unfulfilled would be a gross understatement. Cases, however, are decided on the application of the law to the testimony and the documentary evidence presented in the courtroom, not on innuendo or speculation. In reaching our ruling, we do not decide that there was no wrongdoing on the part of Donald Clark. Rather, we decide that the evidence presented did not support the causes of action contained in the Plaintiffs' complaint.

For the foregoing reasons, the Plaintiffs' claims under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6) are dismissed.

## APPENDIX: Glossary of Entities

*D.P. Clark & Associates:* Donald Clark, president. Its activities were not disclosed on the record; In 1991, DP Clark & Associates was merged, along with other of Mr. Clark's companies, into People$ Financial Resources Corporation (see below).

*Genesis Income Investment Club (Genesis):* Founded 1987, president Donald Clark. Genesis made loans and invested in various assets and business ventures. Subject to an SEC injunction since early 1992, the Club is prohibited from collecting or distributing assets. In late 1992, a committee was formed to dissolve the Club. Plaintiffs George Sexton and Bobbie Lloyd are heavily invested.

*Family Stewardship Planning Associates (FSPA):* Partnerships in several states came under this name, e.g., FSPA of Oklahoma. Plaintiffs Michael and Carol Williams purchased interests in several FSPA partnerships in 1986, interests which FSPI purchased from them in 1987.

*Family Stewardship Planning, Inc. (FSPI):* Donald Clark, president. Parent company to a number of investment clubs which provided financial planning for relatively small investors. Mr. Clark and his brother Kenneth solicited members from churches in the South and Southwest. Merged into People$ Financial Resources Corporation in 1991 (see below).

*Fiduciary Trust Company of the Southwest (Fiduciary):* Paul Welch, president. Trust bank through which Genesis invested in SBA-backed mortgages. Genesis also lent Mr. Welch $400,000. Fiduciary was investigated by Texas banking authorities in 1991, and was seized and eventually closed in 1992.

*Innovative Insurance Company (Innovative):* Provided term insurance to FSPI members. Sherry Armstrong was a key member. Plaintiff George Sexton used $150,000 from an IRA to purchase Innovative stock.

*Pension Plan Trusts (PPP, "Pension Plan"):* Administered by attorney Sherry Armstrong, high rates of return were promised. The nature of Plaintiff Carol Williams' investment was not shown on the record. Plaintiffs Bobbie and Joyce Lloyd invested in a mortgage on a piece of Georgia real estate through PPP, but later withdrew their funds.

*People$ Financial Resources Corporation (PFRC):* Founded by Donald Clark, PFRC became the surviving entity after a 1991 merger of most of the Clark entities. The SEC investigated Mr. Clark's activities following a post-merger PFRC stock offering, which led to an injunction of his business activities.

*The Stewardship Group, Inc.:* Donald Clark, president. Several financial planning enti-

**260**

ties were under its management. Plaintiff George Sexton sold financial planning services part-time for the company. Merged into PFRC in 1991.