**In the Matter of: Doral PAULEY and Jane Pauley, Debtors.**

John KINSLER, Ruth Kinsler, James Eppley, Ruth Eppley, Betty Eppley, Stanley Knudson, Ervin McCarthy, Michael McCarthy, Joseph Mercier, John Rigato, Thomas Novacheff, Robert Frank Sanchez, Virginia Sanchez, Sam Spagnoli, Angelo Spagnoli, William Spagnoli, Daniel Baja, Joanne Baja, Catherine Hebets, Thomas Bates, Lillian Bates, Sam DiRosa, George Dobson, Jack Eckhard, Francesca Eckhard, Verlin Eppert, Rosalie Eppert, Myron Homer, Gail Homer, Agnes Joseph, Courtney Joseph, and Roman Czaplicki, Plaintiffs,

v.

**Doral PAULEY and Jane Pauley, Defendants.**

Bankruptcy No. GK94–80389.
Adv. No. 94–8030.

United States Bankruptcy Court,
W.D. Michigan.

Feb. 24, 1997.

Roger Leemis, Southfield, MI, for Plaintiffs.

Doral and Jane Pauley, in pro. per.

## MEMORANDUM OPINION REGARDING PLAINTIFFS' FIRST AMENDED COMPLAINT TO DETERMINE DISCHARGEABILITY OF A DEBT

JAMES D. GREGG, Bankruptcy Judge.

The principal issue before this court is whether debts arising from alleged violations of state and federal securities laws should be deemed *per se* nondischargeable pursuant to sections 523(a)(2)(A) and 523(a)(4) of the

Bankruptcy Code.[1] For the following reasons, this court concludes that debts arising from securities fraud are not *necessarily* excepted from discharge in bankruptcy; rather, plaintiffs must prove all of the elements required to establish actual fraud under section 523(a)(2)(A) or fraud or defalcation while acting in a fiduciary capacity under section 523(a)(4).

The nondischargeability claims presented in this adversary proceeding arise in a case referred to this court by the Standing Order of Reference entered by the United States District Court for the Western District of Michigan on July 24, 1984. This court has jurisdiction over the case pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Accordingly, the bankruptcy court is authorized to enter a final judgment in this proceeding subject to those appeal rights afforded by 28 U.S.C. § 158.

The following constitutes the court's findings of fact and conclusions of law in accordance with FED.R.BANKR.P. 7052. In reaching its determinations, this court has considered the demeanor and credibility of all witnesses who testified, the exhibits admitted into evidence, and the parties' trial briefs and written closing arguments.

## I. BACKGROUND

This dispute has a long and checkered history that dates back over twenty years. The Plaintiffs[2] invested in oil and gas wells that were developed and operated during the 1970's by the Defendant–Debtors, Doral Verdayne ("Skip") Pauley and his wife, Jane Marie Pauley[3] ("The Pauleys"). The Plaintiffs' investments proved unsuccessful and

their subsequent efforts to recoup their losses in state court litigation were also fruitless. In 1993, the Pauleys filed a joint petition for bankruptcy under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida. The Plaintiffs filed a nondischargeability action in the Florida case and sought a change of venue to Michigan. On October 21, 1993, the Florida Bankruptcy Court granted a motion to change venue to the Western District of Michigan. Following the change of venue the Pauleys' case was converted upon motion of the United States Trustee from a reorganization under chapter 11 to a liquidation under chapter 7.

The convoluted procedural history of this proceeding is set forth in great detail in this court's prior unpublished opinion denying the Pauleys' motion to dismiss. In that opinion, dated January 24, 1996, this court concluded that the Plaintiffs' claims were not time-barred because the applicable Michigan statutes of limitation were tolled while the state court cases were pending before the Michigan circuit and appellate courts. Second, the Plaintiffs claims were not barred by the doctrine of *res judicata* because the Michigan Court of Appeals specifically found that the prior dismissals were or should have been "without prejudice." Finally, the defense of laches did not apply where the Plaintiffs had filed their claims in state court prior to the expiration of the applicable statutes of limitation.

Following the denial of the Defendants' motion to dismiss, a lengthy trial was held before this court including eight days of testimony.[4] The Pauleys represented themselves at trial and the Plaintiffs were repre-

---

**1.** The Bankruptcy Code, as amended, is set forth in 11 U.S.C. §§ 101–1330. Unless otherwise noted, all further statutory references are to Title 11 of the United States Code.

**2.** The Plaintiffs include: John Kinsler, Ruth Kinsler, James Eppley, Ruth Eppley, Betty Eppley, The Estate of Stanley Knudson, Ervin McCarthy, Michael McCarthy, Joseph Mercier, John Rigato, Thomas Novacheff, Robert Frank Sanchez, Virginia Sanchez, Sam Spagnoli, Angelo Spagnoli, William Spagnoli, The Estate of Daniel Baja, Joanne Baja, Catherine Hebets, Thomas Bates, Lillian Bates, Sam DiRosa, George Dobson, The Estate of Jack Eckhard, Francesca Eckhard, Ver-

lin Eppert, Rosalie Eppert, Myron Homer, Gail Homer, Agnes Joseph, Courtney Joseph and Roman Czaplicki.

**3.** Jane Marie Pauley was previously known as Jane Marie Williams, prior to her marriage to Mr. Pauley.

**4.** The trial in this adversary proceeding was held in Grand Rapids, Michigan on the following dates: September 30, October 1, 2, 3, 4, 30, and November 13 and 18, 1996. The trial transcript includes 1343 pages in eight volumes.

sented by Roger H. Leemis.[5] The Plaintiffs called upon both Mr. and Mrs. Pauley to testify as adverse witnesses in the Plaintiffs' case in chief. Plaintiffs' counsel also examined Plaintiffs' former counsel, William L. Truba, who had represented the Plaintiffs in the prior state court litigation against the Pauleys. Only *one* of the named Plaintiffs actually appeared at trial, i.e., Robert Sanchez who testified for less than two hours. Each of the Plaintiffs' witnesses was subjected to cross-examination by the Pauleys.

In addition to presenting live witnesses, the Plaintiffs also submitted deposition testimony including the transcript of the September 28, 1983 deposition of Stanley Knudson, a named plaintiff who is now deceased. Plaintiffs also offered deposition testimony from another deceased individual, Gilbert Gatoni, who was involved in the sale of the oil investments to the Plaintiffs. Mr. Gatoni was deposed on three separate occasions in connection with prior state and federal court cases involving the Pauleys. Finally, Plaintiffs also submitted the deposition testimony of M.W. "Casey" Jones, a geologist who had provided consulting services to the Pauleys in the 1970's. The Jones deposition was taken on September 4, 1986 in connection with the so-called "Trilogy" of related federal court litigation involving the Pauleys. Each of these depositions was admitted into evidence in this adversary proceeding. The Plaintiffs offered a total of 65 exhibits of which 47 were admitted into evidence.

At the conclusion of the seventh day of trial, the Plaintiffs rested. On the eighth and final day of trial, the Defendants called Plaintiffs' counsel, Mr. Leemis to testify concerning the prior state and federal court litigation involving the Pauleys. Mr. Leemis

was given an opportunity to "cross-examine" himself by making a narrative statement. Finally, Mrs. Pauley again took the stand and was examined by Mr. Pauley and was cross-examined by Mr. Leemis. The Defendants offered eight exhibits of which five were admitted into evidence. The Plaintiffs did not offer any rebuttal testimony.

In their First Amended Complaint to Determine Dischargeability of Debt and for Other Relief, the Plaintiffs alleged that the Pauleys had defrauded them in connection with the sale of interests in oil and gas wells in Michigan during the 1970's. Plaintiffs claim to have invested more than $500,000 in numerous oil and gas wells developed and/or operated by the Pauleys. The investments were sold pursuant to Joint Venture Operating Agreements ("JVOA's") which were prepared by the Pauleys and their attorneys. A separate JVOA form was prepared for each of the wells, and was provided to the investors together with additional offering materials. Plaintiffs contend that these written offering materials were incomplete and materially misleading. Plaintiffs further contend that the JVOA's were unregistered non-exempt securities that were sold in violation of state and federal securities laws.

Based on these allegations, Plaintiffs brought the following claims in this adversary proceeding. Count I of the First Amended Complaint alleges that the Defendants sold securities without a license in violation of the Michigan Uniform Securities Act ("MUSA"). Count II alleges that the securities were not registered with the state authorities in violation of MUSA. Count III purports to allege a claim for securities fraud, but does not specify whether the al-

---

**5.** Mr. Leemis has also previously defended the Pauleys' former attorney, Robert G. Corace, Jr., in a legal malpractice claim brought against Mr. Corace by the Pauleys. This claim was one of three cases that were consolidated before the Honorable George E. Woods of the United States District Court for the Eastern District of Michigan (File Nos. 79 74734; 81 72491; and 82 74303). Throughout the trial, these three cases were referred to by Mr. Leemis as "The Trilogy." Apparently, these related federal case resulted in a negotiated settlement which called for the payment of money to both the Pauleys and to some of the Plaintiffs in this adversary proceeding.

The Pauleys argue that this settlement of the federal cases bars the Plaintiffs from bringing their claims in bankruptcy court. There are two problems with this argument. First, it is undisputed that the federal court settlement was never consummated and, hence, the Plaintiffs never received any money. Second, the Plaintiffs in this adversary proceeding were not parties to the prior federal court litigation and, thus, could not be bound by the alleged settlement. Accordingly, contrary to the Pauleys' argument, the settlement of the related federal court litigation does not bar the claims in this adversary proceeding.

leged fraud violates state or federal securities law. Count IV includes a common law claim for breach of contract. Count V asserts a claim for common law fraud. The First Amended Complaint also includes a separate claim in Count VI for "exemplary damages" based on the conduct alleged in Counts I through V. Finally, Count VII alleges that all of the claims against the Defendants–Debtors are nondischargeable pursuant to section 523 of the Bankruptcy Code. It is the last of these claims which this court shall address first, because it involves the ultimate issue of whether or not the alleged debts are dischargeable in bankruptcy.

## II. DISCUSSION

Plaintiffs contend that their claims against the Pauleys give rise to debts that are excepted from discharge under 11 U.S.C. § 523(a)(2)(A) because the allegedly fraudulent investments represent money obtained by false pretenses, false representations, and actual fraud. Plaintiffs also rely on 11 U.S.C. § 523(a)(4) which excepts from discharge any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. Each of these arguments is addressed separately below.

### A. *Section 523(a)(2)(A).*

■■■■ The Supreme Court has instructed that only "honest but unfortunate" debtors should be afforded a "fresh start" in bankruptcy. *Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). For its part, Congress has created various exceptions to the bankruptcy discharge, including one for debts obtained by "false pretenses, false representation, or actual fraud...." *See* 11 U.S.C. § 523(a)(2)(A). The so-called fraudulent debt exception, as with the others enumerated in section 523, is to be strictly construed in favor of the debtor. *Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Manufacturer's Hanover Trust Co. v. Ward (In re Ward),* 857 F.2d 1082, 1083 (6th Cir.1988). The Plaintiffs bear the burden of persuasion, and they must prove every *element* of their case by a preponderance of the evidence.

*Grogan, supra,* 498 U.S. at 291, 111 S.Ct. at 661.

Plaintiffs seek a judgment of nondischargeability against the Pauleys under section 523(a)(2)(A) which reads, in pertinent part:

> (a) A discharge under section 727 ... does not discharge an individual debtor from any debt—
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition....

11 U.S.C. § 523(a)(2)(A).

The elements of a nondischargeability claim under section 523(a)(2)(A) are well-established in the Sixth Circuit:

> [A] plaintiff proceeding under section 523(a)(2)(A) must demonstrate that the debtor obtained money through a material misrepresentation that at the time the debtor knew was false or made with gross recklessness as to its truth. The creditor must also prove the debtor's intent to deceive. Moreover, the creditor must prove that it reasonably relied on the false representation and that its reliance was the proximate cause of loss.

*Brady v. McAllister (In re Brady),* 101 F.3d 1165, 1172 (6th Cir.1996) (citing *Atassi v. McLaren (In re McLaren),* 990 F.2d 850, 852 (6th Cir.1993) and *Coman v. Phillips (In re Phillips),* 804 F.2d 930, 932 (6th Cir.1986)). Recently, the United States Supreme Court has held that the proper measure for reliance is not the objective or "reasonable" standard, but a less demanding "justifiable" reliance standard. *Field v. Mans,* —— U.S. ——, ——–––——, 116 S.Ct. 437, 445–46, 133 L.Ed.2d 351 (1995).

The reliance element is the critical issue in this nondischargeability action. In this proceeding, Plaintiffs contend that the Pauleys are liable for fraud in connection with the sale of securities, and that the debts arising from the alleged fraud is nondischargeable. Accordingly, the threshold legal issue is whether securities fraud is *per se* nondis-

chargeable under section 523(a)(2)(A), regardless of whether or not actual reliance is demonstrated.[6]

### 1. *Securities Fraud.*

The case of *Field v. Mans* involved alleged fraud in connection with real property, as opposed to securities. Nevertheless, the Supreme Court's opinion in that case is instructive. In framing the issue on appeal, the Supreme Court tacitly assumed that some level of actual reliance was required on the part of the creditor in order to make a debt obtained by fraud nondischargeable under section 523(a)(2)(A). For instance, at the outset of the majority opinion, Justice Souter states, "In this case we consider the *level of a creditor's reliance* on a fraudulent misrepresentation necessary to place a debt thus beyond release." —— U.S. ——, 116 S.Ct. at 439 (emphasis added). Justice Souter again reiterates this formulation of the issue as follows: "We granted certiorari to resolve a conflict among the Circuits over the *level of reliance* that § 523(a)(2)(A) requires a creditor to demonstrate." —— U.S. ——, n. 4, 116 S.Ct. at 440, n. 4 (emphasis added) (citations omitted).

The conclusion that actual reliance is required under section 523(a)(2)(A) is made more explicit in the following quotation from *Field v. Mans:*

> The question here is what, if any, level of justification a creditor needs to show *above mere reliance in fact* in order to exempt the debt from discharge under § 523(a)(2)(A). The text that we have just reviewed does not say in so many words. While § 523(a)(2)(A) speaks of debt for value "obtained by ... false pretenses, a false representation, or actual fraud," it does not define those terms or so much as mention the creditor's reliance as such, let alone the level of reliance required. No one, of course, doubts that *some degree of reliance is required* to satisfy the element of causation inherent in the phrase "obtained by," but the Government, as amicus curiae (like petitioners in a portion of their

brief), submits that the minimum level will do.

*Field v. Mans,* —— U.S. ——–——, 116 S.Ct. at 441–42 (emphasis added).

Thus, the Supreme Court's holding that the creditor must show "justifiable" reliance, rather than "reasonable" reliance under section 523(a)(2)(A) is clearly based on the recognition that *"some degree of reliance is required."* Accordingly, while not directly on point, the Supreme Court's ruling in *Field v. Mans* weighs heavily against concluding that a debt arising from a violation of state or federal securities laws would be *per se* nondischargeable under section 523(a)(2)(A). Rather, *Field v. Mans* suggests that a creditor should still have to show that the alleged securities fraud involved "actual fraud" and that the creditor actually *and* justifiably relied on the fraudulent misrepresentations.

Unlike *Field v. Mans,* the Supreme Court's decision in *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) involved allegations of securities fraud. However, *Grogan* did not address the issue of whether the creditor was required to show actual reliance under section 523(a)(2)(A). Instead, the Court held that the preponderance of the evidence standard, rather than clear and convincing evidence standard, applies to all exceptions from dischargeability of debts contained in section 523(a), including the nondischargeability for actual fraud. Thus, the Supreme Court's decision in *Grogan* does not provide much guidance with respect to the issue of whether debts arising from securities fraud are *per se* nondischargeable.

The United States Court of Appeals for the Sixth Circuit has not directly addressed the issue of whether securities fraud is *per se* nondischargeable under section 523. However, the recent decisions from the Sixth Circuit leads one to conclude that some degree of actual reliance is required in order for a debt to be excepted from discharge under section 523(a)(2)(A). As previously noted, the Sixth Circuit has repeatedly held that

---

**6.** This court framed the issue on the record at the close of trial: "[A]ssuming that there is a violation of securities laws, ... does that mandate that the debts to the various plaintiffs would be,

per se, nondischargeable? ... [I]s violation of security law equivalent to the court finding or making a holding that the debt is nondischargeable?" Transcript at 1338.

"reliance" is one of the elements of a nondischargeability claim under section 523(a)(2)(A). *See Brady v. McAllister (In re Brady)*, 101 F.3d at 1165 (6th Cir.1996) ("Moreover, the creditor must prove that it reasonably relied on the false representation and that its reliance was the proximate cause of loss.") (quoting *Atassi v. McLaren (In re McLaren)*, 990 F.2d 850, 852 (6th Cir.1993) and *Coman v. Phillips (In re Phillips)*, 804 F.2d 930, 932 (6th Cir.1986)). *See also Longo v. McLaren (In re McLaren)*, 3 F.3d 958 (6th Cir.1993) (same). This formulation of the reliance requirement was modified by the Supreme Court's decision in *Field v. Mans* which held that the creditor must merely show that its reliance was "justifiable" as opposed to "reasonable." *Field v. Mans,* —— U.S. ——–——, 116 S.Ct. at 445–46. Nevertheless, it appears that the Sixth Circuit would still require that the creditor prove some level of actual reliance. Indeed, the Supreme Court's requirement of "justifiable" reliance, necessarily assumes proof of actual reliance.

A recent decision from the bankruptcy court from the Northern District of Illinois lends further support to the view that a showing of actual reliance is required under section 523(a)(2)(A). In *AT & T Universal Card Services v. Alvi (In re Alvi)*, 191 B.R. 724 (Bankr.N.D.Ill.1996) the bankruptcy court stated, "Thus, *Field* requires that for a debt to be nondischargeable under section 523(a)(2)(A), the Creditors must have, in fact, relied on the Debtor's actual representation, and that the Creditors' reliance must have been 'justifiable.'" *Alvi*, 191 B.R. at 729. Later in the opinion, the court stated, "Of course, before embarking on an analysis of whether the creditor acted justifiably, the Court first must be sure that the Creditors proved they actually relied on representations of the Debtor." *Alvi*, 191 B.R. at 730–31. The *Alvi* case involved allegations of credit card fraud, rather than securities fraud; however, the general principles regarding the need to prove actual reliance are equally applicable to all claims brought pursuant to section 523(a)(2)(A).

In a case that involved the dischargeability of debts arising from securities fraud, the United States District Court for the Western District of Michigan upheld the judgment of the bankruptcy court finding that the debts were dischargeable because there was no showing that the fraud resulted in actual benefit to the debtors. *See McHenry v. Ward*, 115 B.R. 532 (W.D.Mich.1990). In affirming the bankruptcy court, the district court held, *inter alia*, that the creditor had failed to demonstrate that the debtor had benefited from the alleged fraud as required under section 523(a)(2)(A).[7] The district court also found that the bankruptcy court had correctly concluded that the creditor had failed to prove the element of reliance.

Then, as it should have, the [bankruptcy] court analyzed whether each appellant had reasonably relied upon appellee Ward's nondisclosure about the stock purchases. The court reasoned that since McHenry bound himself to a subscription agreement with Horlings in May 1980, he could not have relied upon the nondisclosure by appellee Ward whom he met in June 1980. This conclusion is logical and well-grounded on the facts in the record. Likewise, Wiersma signed a stock purchase agreement in May 1980—before he ever met Ward.

---

7. The courts are split on the issue of whether a creditor must show that the debtor actually benefitted, directly or indirectly, from the alleged fraud in order for a debt to be deemed nondischargeable under section 523(a)(2)(A). *See generally, HSSM # 7 Limited Partnership v. Bilzerian (In re Bilzerian)*, 100 F.3d 886, 890–91 (11th Cir.1996) (comparing three approaches and adopting the "receipt of benefits" theory). The reasoning of the *Ward* court on this point has been called into question. *See Jacobs v. Mones (In re Mones)*, 169 B.R. 246 (Bankr.D.C.1994) (suggesting that a debt could be held nondischargeable even if the debtor did not personally benefit from the fraud). However, the Sixth Circuit has recently reaffirmed this portion of the *Ward* decision. *See Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172 (6th Cir.1996) ("Assuming that a plaintiff proceeding under section 523(a)(2)(A) must show that the debtor directly or indirectly obtained some tangible or intangible financial benefit as a result of his misrepresentation...." (citing *Ward*)). In this proceeding, there is no dispute that Mr. and Mrs. Pauley benefitted, either directly or indirectly, from the money they received from the investors. Accordingly, this court need not address the issue.

*McHenry v. Ward,* 115 B.R. at 539. In a footnote to its opinion, the district court explicitly stated that reliance will not be inferred:

> The precise issue here is not, as appellants suggest, whether any reasonable man would have invested in the stock plan if the true facts were known. In order to prevent discharge of Ward's debt here, each appellant must show that he, as the creditor, reasonably relied upon the debtor Ward's failure to disclose material facts about the stock purchase plan.

*McHenry v. Ward,* 115 B.R. at 539, n. 3.

■ The foregoing authority from within this Circuit mandates the conclusion that debts arising from securities fraud should not be deemed nondischargeable *per se.* Rather, the creditor must prove each of the elements required under the fraud exception contained in section 523(a)(2)(A), including the element of justifiable reliance.

This conclusion does not mean that debts arising from securities fraud claims can never be excepted from discharge. For instance, in *Jacobs v. Mones (In re Mones),* 169 B.R. 246 (Bankr.D.C.1994), a group of investors filed an adversary proceeding against their investment advisor alleging that he had fraudulently induced them to invest in risky options. As in this adversary proceeding, the investors in *Jacobs v. Mones* sought to hold the debts nondischargeable on basis of false representations and fraud under section 523(a)(2)(A) and under a theory of defalcation by a fiduciary pursuant to section 523(a)(4). In *Jacobs v. Mones,* the debtor argued that there was no specific exception from discharge for securities fraud claims and that such claims should not be deemed nondischargeable because the elements of securities violations differed from the elements of actual fraud under section 523(a)(2)(A). On debtor's motion to dismiss for failure to state claim, the bankruptcy court held, *inter alia,* that allegations of securities law fraud could suffice to establish fraud for purposes of fraud exception to discharge. However, in so holding, the bankruptcy court made it clear that securities fraud was not necessarily *per se* nondischargeable. Rather, the creditor still had to prove the element of reliance.

In addition to the defendant's argument that section 523(a)(2)(A) is limited to the amount of any commissions, the defendant contends that any judgment awarded pursuant to Counts I and II for violations of federal and state securities laws fails to give rise to a debt that may be held nondischargeable pursuant to section 523(a)(2). Defendant argues that because fraud as defined in the securities laws is broader than fraud in the Bankruptcy Code, which the plaintiffs have conceded, as a matter of law such violations are insufficient to constitute an exception to discharge.

Defendant's argument, however, is flawed because it assumes that a person who violates the securities laws never does so by committing actual fraud. It is certainly possible to envision a violator of the securities laws who does so with actual intent to deceive. Therefore, the court rejects the defendant's argument that section 523(a)(2)(A) does not apply as a matter of law to any judgment awarded pursuant to Counts I and/or II.

*Jacobs v. Mones,* 169 B.R. at 254 (citations omitted). In a footnote to its opinion the court further clarified the distinction between securities fraud and "actual fraud" under section 523(a)(2)(A):

> For a debt to be nondischargeable under section 523(a)(2), the debtor's conduct must involve moral turpitude or intentional wrong; mere negligence, poor business judgment or fraud implied in law is insufficient. However, the securities laws can be violated upon the showing of scienter which may not rise to the level of actual fraud.

*Jacobs v. Mones,* 169 B.R. at 254, n. 6.

In denying the debtor's motion to dismiss, the bankruptcy court held that the plaintiffs had alleged sufficient facts to support a claim for nondischargeability pursuant to section 523(a)(2)(A). These allegations included the element of actual reliance, "Finally, plaintiffs have alleged that but for those representations, they would not have invested in the program and, therefore, their loss would not

have occurred." *Jacobs v. Mones,* 169 B.R. at 254–55.

■ This court agrees that the Plaintiffs must prove by a preponderance of the evidence that they justifiably relied on the Pauleys' representations and that, but for those representations, they would not have invested in the oil and gas wells. In other words, the Plaintiffs must prove both actual and justifiable reliance. Plaintiffs simply argue that securities fraud "ought to be *per se* nondischargeable." *See* Plaintiffs' Posthearing Brief, p. 36. However, Plaintiffs fail to cite any statutory or common law authority to support their view of what the law "ought to be." There is no specific provision in section 523 which would except from discharge debts arising from securities fraud. Presumably, if Congress had wanted to create a specific exception for securities fraud, it could have easily done so. In the absence of such a provision, the creditors who seek to have their securities fraud claims deemed nondischargeable must prove all of the elements of actual fraud under section 523(a)(2)(A), including the element of justifiable reliance.

This interpretation of section 523(a)(2)(A) is consistent with two recent opinions from the Bankruptcy Court of the Western District of Michigan in which the court discharged debts in cases involving allegations of securities fraud. *See Armbrustmacher, et al. v. Redburn (In re Redburn),* 202 B.R. 917 (Bankr.W.D.Mich.1996) and *Butler v. Clark (In re Clark),* 202 B.R. 243 (Bankr.W.D.Mich. 1996). Although these cases are not directly on point, they are in accord with the view that securities fraud claims are not *per se* nondischargeable. This holding is also in accord with the general rule of construction that exceptions to discharge are to be strictly construed in favor of the debtor. *See Butler v. Clark (In re Clark),* 202 B.R. at 253 (citing *Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Manufacturer's Hanover Trust Co. v. Ward (In re Ward),* 857 F.2d 1082, 1083 (6th Cir.1988)).

Thus, even assuming that the Plaintiffs can prove that the Pauleys sold unregistered, non-exempt securities in violation of federal in state securities laws these alleged viola-

tions are not necessarily sufficient to establish that the losses resulting from the sales should be deemed nondischargeable. Having determined that debts arising from securities fraud are not nondischargeable *per se,* this court must now examine the record in order to decide whether the Plaintiffs met their burden of proving the elements of actual fraud under section 523(a)(2)(A).

### 2. *Actual Fraud.*

The Plaintiffs alleged various misrepresentations in connection with the oil and gas investments that were sold by the Pauleys. Plaintiffs' Exhibit 1 consists of a typewritten summary of each of the investments made by each of the Plaintiffs in the various oil and gas wells that were developed and/or operated by the Pauleys. This summary exhibit was admitted into evidence over the objection of the Pauleys. Transcript at 643. Later in the trial, following the close of the Plaintiffs' proofs, the Pauleys stipulated to the fact that, with the exception of Courtney Joseph, each of the Plaintiffs listed in the summary exhibit had invested in the various oil and gas wells pursuant to a standard form disclosure/agreement. Transcript at 1231–34. Each of these investment packages contained three separate sections: (1) "Division I, Notice to Investors"; (2) "Joint Venture Operating Agreement," ("JVOA"); and (3) "Division II," which set forth various information relative to the specific offering including a map showing the locations of the proposed well. Examples of these investment packages can be found in Plaintiffs' Exhibits 28, 29 and 30.

The single page Division I, Notice to Investors, included a signature line whereby the investor acknowledged that the "fractional working interest" offered in the JVOA was not registered under state or federal securities laws and was not transferrable. The four page JVOA was signed by both the investor and by one of the Pauleys. In some cases, the JVOA was signed by Mr. Pauley on behalf of Pauley Oil Company. In other cases, the JVOA was signed by Mrs. Pauley (under her prior name of Jane Williams) on behalf of International Crude Oil Company. The evidence at trial indicated that both Mr. and Mrs. Pauley took an active role in oper-

ating both companies and that the lines between the operations were often blurred.[8]

The JVOA described an investment in an oil and gas well with two distinct phases to the project. In phase one, the Pauleys agreed to drill the well to a specific depth, or to a lesser depth if they struck oil. If the well was "dry," it would be plugged and the investors would lose their initial investment. However, if the Pauleys determined that the well was a "commercial producer," they would notify the investors with a "completion letter" asking them to contribute additional money for "completion costs" in phase two. As a result of their initial investment and their subsequent contribution to completion costs, the investors were entitled to share in the net profits from the sale of oil and gas produced by the well. The Pauleys retained a substantial ownership interest in each well and also shared in the profits. The Pauleys and/or their related companies also received fees for drilling and operating the wells.

In most cases, the initial investment received from each Plaintiff was $3,500, followed by a second investment of $1,500 for completion costs. Many of the Plaintiffs invested in more than one oil and gas well and many purchased more than one unit in a single well. *See* Plaintiffs' Ex. 1. In most cases, the Plaintiffs also paid the additional $1,500 for completion costs. *Id.* All together, the Plaintiffs invested approximately $520,000 in 19 separate oil and gas wells that were drilled and/or operated by the Pauleys during 1976 and 1977.[9]

■ The primary thrust of the Plaintiffs' fraud claims is that both the initial offering materials and the subsequent "completion letters" were fraudulently misleading. Many of the allegedly fraudulent misrepresentations were not affirmative statements; but rather, Plaintiffs allege that the written statements were fraudulently misleading because they failed to disclose certain material information that would be relevant to a reasonable investor. It is well established that fraud by omission may give rise to a nondischargeable debt. In a case involving section 17(a)(2) of the Bankruptcy Act, the statutory predecessor to Section 523(a)(2)(A), the Sixth Circuit stated, "That such deception takes the form of an intentional nondisclosure of material fact or an implied misrepresentation makes no difference." *See Semaan v. Allied Supermarkets, Inc.*, 951 F.2d 718, 728 (6th Cir.1991) (citations omitted). *See also McHenry v. Ward (In re Ward)*, 115 B.R. 532, 539 (W.D.Mich.1990) ("Appellants correctly state that material omissions can form the basis of misrepresentation under § 523(a)(2)(A)." (citations omitted)). *Cf. Sumitomo Trust & Banking Co. v. Holly's, Inc. (In the Matter of Holly's, Inc.)*, 140 B.R. 643, 694 (Bankr.W.D.Mich.1992) ("fraud may be consummated by suppression of facts and of the truth, as well as by open false assertions...." (citations omitted)).

The Plaintiffs allege a variety of fraudulent nondisclosures. For instance, Plaintiffs cite to a portion of the standard form "completion letters" in which Mr. Pauley states, "We have encountered dolomite containing oil and gas on our [oil and gas well].... From all indications, the [specific well] should make a fine producing well." *See* Plaintiffs' Exhibit 28. Plaintiffs contend that the dolomite rock in the Albion–Scipio Trend where the wells were drilled would almost always produce a "show of oil" that could be used to justify completion of the well, but that the actual

---

**8.** For purposes of this nondischargeability proceeding, the Pauleys have presented a joint defense and neither has attempted to exonerate themselves at the expense of their spouse. Thus, this court will not attempt to differentiate between the Defendants in determining whether the claims against them are dischargeable. *Compare In re Luce*, 960 F.2d 1277 (5th Cir.1992) (husband's fraud on behalf of partnership was imputed to wife where she was his business partner and shared in the benefits of the fraud; therefore, claims against both were held nondischargeable) (cited with approval in *BancBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1561 (6th Cir.1992) (holding fraud of one partner could be imputed to second general partner who had no actual knowledge of fraud, so as to render second partner's debt to bank nondischargeable)).

**9.** Although the Plaintiffs presented evidence concerning the total amount of their investments, there was very little evidence presented at trial regarding the amount of returns, if any, the Plaintiffs received on their investments. Thus, the Plaintiffs' proofs with respect to the issue of damages are somewhat problematic.

productive capacity of the well could not be determined until after completion. Thus, Plaintiffs argue that these statements in the completion letters are misleading.

 There are two problems with Plaintiffs' argument. First, the completion letters were not sent out until *after* the Plaintiffs had already made their original investment in each well. Thus, there could not possibly be any causal connection between the alleged misrepresentations in the completion letters and the Plaintiffs' initial investment decisions. *Cf. McHenry v. Ward,* 115 B.R. at 539 (plaintiff-investors could not have relied on alleged nondisclosure where investments were made before they even met the defendant-debtor). Accordingly, to the extent that the Plaintiffs' claims are based on the allegedly fraudulent nature of the completion letters, the Plaintiffs' damages would be limited to those funds invested for completion costs which represent a small fraction of the total investments.

 Second, and more importantly, Plaintiffs failed to present any evidence that any of them actually relied on any the statements contained in either the completion letters or the initial offering materials. Plaintiffs argue that the Pauleys did not provide them with sufficient information regarding oil prices, production costs and monthly production levels that would enable the Plaintiffs to adequately assess the risks and economic feasibility of their investments. Plaintiffs also contend that the geological descriptions of the wells as set forth in "Division II" of the offering materials was "hopelessly incomplete and thus misleading." *See* Plaintiffs' Posthearing Brief, p. 16. However, *Plaintiffs never produced any evidence at trial that would show that they would not have invested their money if this information had been available to them.* It is not enough for this court to speculate as to what a "reasonable investor" would consider important in making an investment. In order to establish the alleged debts as nondischargeable under section 523(a)(2)(A), it is incumbent upon the Plaintiffs to prove by a preponderance of the evidence that they actually and justifiably relied on the allegedly false and misleading statements and omissions made by the Pauleys.

The district court's opinion in *McHenry v. Ward,* discussed *supra,* is directly on point. At the conclusion of its opinion, the district court clearly stated that the creditor is required to prove actual reliance, and that failure to do so will result in a determination that the fraudulent debt is dischargeable.

> Last, as appellee points out, there was no evidence presented by appellant Brennan on the question of reasonable reliance, an issue in which he bears the burden of proof. Appellants now argue to this Court that general evidence abounds on the record which demonstrates that Brennan "would not have invested if the true facts [concerning the stock purchase] were known by him." Again, though, this showing is insufficient under § 523(a)(2)(A). The inquiry under this statute must necessarily include proof that Brennan reasonably relied upon Ward's nondisclosure of facts concerning the stock purchase. There is simply no testimony on the record concerning this issue as to Brennan and Ward's interaction.

*McHenry v. Ward,* 115 B.R. at 539.

Likewise, there is simply no testimony in the record of this proceeding regarding the Plaintiffs' reliance on the allegedly fraudulent nondisclosures. As noted above, only one of the Plaintiffs actually appeared and testified in this proceeding. Mr. Sanchez testified that he had invested a total of $25,000 in five different oil and gas wells. Transcript at 292. Mr. Sanchez purchased the investments from Gilbert Gatoni in 1977. Transcript at 282. Mr. Sanchez did not deal directly with the Pauleys and never even met them. Transcript at 302. Not surprisingly, given the passage of almost twenty years, Mr. Sanchez's recollection of these events was somewhat vague. During his direct examination, Mr. Sanchez, who is 71 years old, admitted that his memory had faded due to the passage of time and that his memory had been adversely affected by recent health problems. Transcript at 308.

Generally, Mr. Sanchez testified that some of his co-workers had introduced him to Mr. Gatoni who was acting as a promoter for the

oil and gas investments. Transcript at 302. On more than one occasion, Mr. Sanchez and his colleagues met with Mr. Gatoni who took them on field trips to inspect the oil fields. Often these trips included dinner and drinks with the investors and their spouses. Transcript at 311. During the course of the direct examination, Plaintiff's counsel asked a series of leading questions regarding various facts which Mr. Gatoni had not disclosed. Transcript at 304–308. At no time, however, did Mr. Sanchez state that any of these alleged nondisclosures were material to his investment decision. Mr. Sanchez had only a very vague recollection of the JVOA, and he never indicated that he had relied on any particular statement in the offering materials. Transcript at 308, 319–20, 322, 332. Rather, based upon his overall testimony, the court finds that Mr. Sanchez made his decision to invest based on the recommendation of his friends who had also invested their money with Mr. Gatoni. On cross-examination, Mr. Sanchez testified that Mr. Gatoni had "made it sound so promising," but Mr. Sanchez conceded that he knew it was "never a sure thing." Transcript at 325.

Even assuming that Mr. Gatoni was acting as the agent of the Pauleys and that the Pauleys could be held vicariously liable for his alleged misrepresentations, the Plaintiffs failed to present *any* evidence that Mr. Sanchez actually relied on a specific false representation or fraudulent omission by Mr. Gatoni. Nor did Mr. Sanchez cite a single statement in the written offering materials upon which he relied that was false or materially misleading. The total absence of any evidence of actual reliance on the part of Mr. Sanchez prevents this court from concluding that his claims against the Pauleys are excepted from discharge in bankruptcy pursuant to section 523(a)(2)(A).

The lack of evidence regarding reliance is even more obvious with respect to the remaining Plaintiffs who did not testify or even appear at trial. Plaintiffs' counsel attempted to introduce the affidavits of three of the Plaintiffs. *See* Plaintiffs' Exhibits 28, 29 and

30. However, the Pauleys objected to the affidavits, and only the exhibits that were attached to the affidavits were admitted into evidence. Transcript at 358–361. Thus, the affidavits themselves are not in evidence and the statements contained therein cannot be used to establish proof of reliance. The transcript of a deposition of one of the Plaintiffs, Stanley Knudson, was admitted into evidence without objection. *See* Plaintiffs' Exhibit 62.[10] Obviously, Mr. Knudson's deposition testimony cannot provide evidence of actual reliance on the part of the other Plaintiffs. Moreover, Plaintiffs' counsel has not cited a single passage in the transcript that would provide sufficient evidence to prove that Mr. Knudson himself relied on a specific misrepresentation or omission such that his claims against the Pauleys would be deemed nondischargeable.

This court's reading of the transcript reveals Mr. Knudson's deposition testimony was similar to Mr. Sanchez's trial testimony. In both cases, the Plaintiffs apparently purchased their interests in the oil and gas wells through Mr. Gatoni. The transcript includes two brief statements by Mr. Knudson which could be viewed as supporting the conclusion that he would not have invested had he known that other wells in the area were not highly productive. *See* Plaintiffs' Exhibit 62 (Knudson deposition, pp. 41–42). However, there is no evidence to support the underlying assertion regarding the productivity of the surrounding wells. In reviewing the deposition testimony in its entirety, Mr. Knudson has not sufficiently established actual and justifiable reliance upon false representations or material omissions made by the Pauleys.

The Pauleys stipulated that, with the possible exception of Courtney Joseph, each of the Plaintiffs received a copy of the written offering materials, including the JVOA through which they purchased their interests in the oil and gas wells. Transcript at 1231–34. However, the fact that each of the Plaintiffs received these materials does not prove that any of them relied on a particular state-

**10.** Mr. Knudson's deposition was taken on September 28, 1983, in connection with the case filed against the Pauleys and Mr. Gatoni in Hills-

dale County Circuit Court. As noted above, this litigation was eventually dismissed without prejudice.

ment that was incomplete or misleading. Reiterating, it is not sufficient for the Plaintiffs to argue in the abstract that any reasonable investor would not have purchased these investments if they were aware of various undisclosed risks. Plaintiffs have the burden of proving that they themselves, actually relied on specific misrepresentations or nondisclosure of fact, and that their reliance was justified. In the absence of any evidence of actual reliance, Plaintiffs cannot possibly prove the requisite element of justifiable reliance. Because the Plaintiffs have utterly failed in presenting any proof of this essential element of reliance, their claims seeking to except their debts from discharge under section 523(a)(2)(A) must be denied.

### B. *Section 523(a)(4).*

Plaintiffs also assert that the liability arising from their claims against the Pauleys is nondischargeable pursuant to section 523(a)(4), which provides in pertinent part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

As previously noted, a creditor seeking an exception to discharge under section 523 must sustain its burden by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. at 291, 111 S.Ct. at 661. In addition, exceptions to discharge are to be construed strictly. *Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Manufacturer's Hanover Trust Co. v. Ward,* 857 F.2d 1082, 1083 (6th Cir.1988).

### 1. *Fraud or Defalcation While Acting in a Fiduciary Capacity.*

■ The required elements of proof for a claim of fraud or defalcation under section 523(a)(4) are as follows: (1) there must be an express trust status as to the property at issue; (2) the debtor must have been acting in a fiduciary capacity; and (3) the debtor

must have breached this relationship by fraud or at least defalcation of funds. *McHenry v. Ward,* 115 B.R. at 540 (W.D.Mich.1990) (citing *Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.),* 760 F.2d 121 (6th Cir. 1985)).

With respect to the requirement of an express trust, Plaintiff argues, "Some courts have limited 'fiduciary capacity' to express trusts; but the better rule is that partners and joint ventures are fiduciaries as to each other, especially as to the managing agent for the venture." *See* Plaintiffs' Posthearing Brief, p. 31 (citing *In re Short,* 818 F.2d 693, 695–96 (9th Cir.1987)). Unfortunately for Plaintiffs, the United States Court of Appeals for the Sixth Circuit is among those courts which require proof of an express trust, and the pronouncements of that court are controlling in this case.[11]

■ The Sixth Circuit specifically stated, "The term 'fiduciary' applies only to express or technical trusts and does not extend to implied trusts, which are imposed on transactions by operation of law as a matter of equity." *See Carlisle Cashway, Inc. v. Johnson (In re Johnson),* 691 F.2d 249, 251–52 (6th Cir.1982) (citing *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934)). According to Sixth Circuit case law, the requirements of an express trust, are as follows: (1) a clearly defined res; (2) an unambiguous trust relationship; and (3) specific, affirmative duties undertaken by a trustee. *See In re Johnson,* 691 F.2d at 252–53 (express trust requirements under section 17(a)(4)). In the case of *In re Johnson,* the Sixth Circuit concluded that an express statutory trust arose under the Michigan Building Contract Fund Act. *In re Johnson,* 691 F.2d at 252–53. However, the Plaintiffs in this action have not shown that any similar statute is applicable in this case that would give rise to an express trust.

---

**11.** In addition, the Sixth Circuit has ruled it is improper for a bankruptcy court to impose a constructive trust because "a constructive trust unlike an express trust, is a remedy [and] does not exist until a plaintiff obtains a judicial deci-

sion finding him to be entitled to a judgment 'impressing' defendants' property or assets with a constructive trust." *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.),* 16 F.3d 1443, 1451 (6th Cir.1994).

Moreover, the Sixth Circuit recently reaffirmed the requirement that a creditor who seeks to hold a debt nondischargeable pursuant to section 523(a)(4) must establish the existence of an express trust. *See Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1173 (6th Cir.1996) (citing *In re Johnson, supra*). After restating the rule regarding the existence of an express trust, the Sixth Circuit declined to decide the issue of whether the requirement was met in that particular case because it had already concluded that the debt was nondischargeable on other grounds. *See Brady v. McAllister*, 101 F.3d at 1173–74 ("We do not need to address whether creditor proved the existence of an express trust, however, because the proper findings by the lower courts that debtor incurred a nondischargeable debt through both false pretenses and embezzlement already provide independent reasons to affirm.") The Sixth Circuit's opinion in *Brady* demonstrates the continued vitality of the express trust requirement within this Circuit, even though the court did not need to apply the rule in that case. In this proceeding, there is no showing that an express trust was created.

Plaintiffs argue that they can meet the lesser burden of showing a "defalcation" on the part of the Pauleys. The term "defalcation" is not defined in the Code and courts have disagreed over its meaning in this context. The Sixth Circuit held in *In re Johnson*, that while proof of negligence or mistake of fact will not support a finding of defalcation, proof of actual fraud is not required. *Johnson*, 691 F.2d at 256. According to *Johnson*, the 'bad act' which will amount to defalcation in a fiduciary capacity "is supplied by an individual's special legal status with respect to another, with its attendant duties and high standards of dealing, and the act of breaching those duties." *Id.* at 257.

Even assuming that "defalcation" does not require fraudulent intent, (and assuming a fiduciary relationship existed) Plaintiffs still failed to meet their burden of proof by a preponderance of the evidence as required under section 523(a)(4). All of the Plaintiffs' allegations of wrongdoing by the Pauleys center on their contention that the Pauleys fraudulently misled them with respect to the risks and potential returns on their investment. The Plaintiffs do *not* make any allegations that the Pauleys misappropriated funds raised from the investors by failing to use the proceeds to drill for oil. There is no evidence in the record which even suggests that the Pauleys absconded with any money by placing it in their personal accounts. Nor is there any evidence that the Pauleys improperly failed to account for the funds that were invested. As previously noted, the Plaintiffs presented very limited proofs regarding their alleged damages beyond the amounts that they initially invested. However, even assuming that Plaintiffs did not receive any returns and lost all of the monies they invested, this fact alone would not constitute a "defalcation" on the part of the Pauleys. Just because an investment proves unsuccessful does not mean that there was a "defalcation" within the meaning of section 523(a)(4).

This conclusion is consistent with other cases decided in this district in which courts have refused to find that losses on investments were nondischargeable under section 523(a)(4). *See, e.g., Butler v. Clark (In re Clark)*, 202 B.R. 243 (Bankr.W.D.Mich.1996) (investors who gave their retirement funds to chapter 7 debtor to invest according to his Christian philosophy, failed to prove a defalcation even assuming the existence of a fiduciary relationship under section 523(a)(4)). *Cf. McHenry v. Ward*, 115 B.R. at 540 (W.D.Mich.1990) (securities fraud judgement was not excepted from discharge under section 523(a)(4) because there was no fiduciary relationship between investors and defendant-debtor).

### 2. *Embezzlement.*

The Sixth Circuit has recently set forth the elements of an "embezzlement" claim under section 523(a)(4):

Federal law defines "embezzlement" under section 523(a)(4) as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hand it has lawfully come." A creditor proves embezzlement by showing that he entrusted his property to the debtor,

the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud.

*Brady v. McAllister (In re Brady),* 101 F.3d at 1172–73 (citations omitted). In *Brady,* the Sixth Circuit upheld the bankruptcy court's finding that the debtor had misappropriated a portion of the proceeds from a real estate sale by transferring them to a corporation which he controlled, rather than sharing them with his partner. In contrast, there is no evidence in this proceeding that the Pauleys did not properly share the revenue, if any, from the oil and gas wells in accordance with the terms of their agreements with the Plaintiffs.

This court has previously found that the total lack of evidence concerning reliance on the part of the Plaintiffs precludes a finding of actual fraud under section 523(a)(2)(A). This finding also supports the conclusion that the Plaintiffs have failed to demonstrate that the "circumstances indicate fraud" as required to establish embezzlement for purposes of section 523(a)(4). Furthermore, Plaintiffs failed to demonstrate that the Pauleys "appropriated the property for a use other than that for which it was entrusted." There is nothing in the record to show that the Pauleys used the investors' money for anything other than drilling and/or operating oil and gas wells. Thus, Plaintiffs have failed to prove by a preponderance of the evidence that their claims against the Pauleys should be nondischargeable under section 523(a)(4).

## III. CONCLUSION

As Judge Stevenson has stated in a recent opinion involving the dischargeability of securities fraud claims:

> The Court understands the frustration that the Plaintiffs must feel over their experience with the [debtor-] related entities. They have invested substantial sums of money which they have tried and failed to retrieve from [a debtor-related entity] and other sources since early 1992. They made these investments hoping to receive substantial returns. To say that their hopes have gone unfulfilled would be a gross understatement. Cases, however,

are decided on the application of the law to the testimony and the documentary evidence presented in the courtroom, not on innuendo or speculation. In reaching our ruling, we do not decide that there was no wrongdoing on the part of [the debtor]. Rather, we decide that the evidence presented did not support the causes of action contained in the Plaintiffs' complaint.

*Butler v. Clark (In re Clark),* 202 B.R. at 259. Judge Stevenson's comments are equally applicable to this adversary proceeding.

For all the foregoing reasons, the Plaintiffs' claims seeking to establish the nondischargeability of the debts allegedly owed by the Pauleys under sections 523(a)(2)(A) and 523(a)(4) are hereby dismissed. Because the alleged debts are dischargeable, this court need not address the merits of the underlying claims against the Pauleys.